(No. 62737.—

# NORA E. DULDULAO, Appellee, v. SAINT MARY OF NAZARETH HOSPITAL CENTER, Appellant.

*Opinion filed January 30, 1987.—Rehearing denied March 30, 1987.*

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (James E. McParland, Tom H. Luetkemeyer and Keith E. Graham, of counsel), for appellant.

Lonny Ben Ogus and Carl M. Walsh, of Chicago, for appellee.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Nora E. Duldulao, brought this action in the circuit court of Cook County, alleging that defendant, St. Mary of Nazareth Hospital Center, discharged her from its employ in violation of the terms of an employee handbook. Plaintiff claimed that the handbook, distributed by defendant, created enforceable contractual rights. Both parties moved for summary judgment. The trial court denied plaintiff's motion but granted defendant's motion, entering judgment in favor of defendant. The appellate court reversed both rulings. (136 Ill. App. 3d 763, 765-66.) This court allowed defendant's petition for leave to appeal (103 Ill. 2d R. 315).

Defendant raises four issues for review: (1) Did the employee handbook in this case create contractual terms binding defendant to a particular procedure for terminating plaintiff's employment? (2) Did defendant in fact terminate plaintiff's employment in accordance with the provisions of the employee handbook? (3) Did the appellate court improperly reverse the denial of plaintiff's motion for summary judgment? and (4) Did the appellate court err in deciding the case without oral argument?

Defendant initially hired plaintiff in 1968, and rehired her in 1970 when she returned from a brief stay in the Philippines. In 1971 she was promoted to head nurse, and in 1972 she was named staff development coordinator of the department of nursing. She served in this position until September 14, 1981, when defendant reorganized several of its departments. Plaintiff became human resources development coordinator, a position which she claims was identical to her previous position. Defendant, however, submitted the affidavits of supervisors who claim that plaintiff's new position included new

duties and responsibilities. On December 11, 1981, plaintiff was given a sheet entitled "Probationary Evaluation" and also a "Final Notice" informing her that she was terminated as of the end of the day. Both sheets listed essentially the same alleged infractions:

> "Unsatisfactory performance was demonstrated by the failure to properly monitor the Legal Implications of Documentation seminar and the Patient Education seminar. Further unsatisfactory performance was demonstrated by failure to follow instructions regarding CPR recertification and monitoring of the Patient Education Seminar."

Plaintiff claims that her termination violated procedural rights she had by virtue of an implied contract with defendant. The terms of this contract, plaintiff claims, are to be found in an employee handbook distributed by defendant. Defendant first published an employee handbook before plaintiff was rehired in 1970. The record before us does not reveal the contents of this initial employee handbook other than the fact that it required two weeks' notice for the dismissal of probationary employees. Plaintiff's deposition reveals that she did not discuss the contents of this handbook during her rehiring interview in 1970, although she became aware of it some time after returning to work, and subsequently used it in training sessions for new employees.

In 1975 defendant published a revised employee handbook. At the beginning of this handbook is the following note, signed by Sister Stella Louise, president of the hospital:

> "N.B. The Personnel Policies of Saint Mary of Nazareth Hospital Center are presented in this booklet in a summarized form. Further details regarding any policy may be obtained by consulting the master file in the Personnel Department.
>
> It is then necessary that every employee of Saint Mary of Nazareth Hospital Center be well informed on hospital policy and other pertinent information that will

assist him in directing his total efforts toward the best patient care possible. A booklet containing hospital and personnel policy is given to each employee. As a new policy change is finalized, a copy will be given to every employee to be read and placed in his booklet. If a policy needs clarification, your Supervisor or Department Head will be happy to assist you in its interpretation.

Please take the time to become familiar with these policies. They are designed to clarify your rights and duties as employees. Your observance of these policies will produce a safe and pleasant environment in which to work and assure you a respected place in Saint Mary's family of employees."

Among other things the 1975 handbook modified the previous policy which had required two weeks' notice for dismissal of a probationary employee. The 1975 handbook, as amended by a policy statement finalized on June 18, 1981, provided that "[a]n employee may be terminated without notice but for just cause during the initial probationary period." The probationary period was to last 90 days, unless "extended up to 180 days by the department head for just cause." Once an employee successfully completed the probationary period he or she was to become a "permanent employee." Permanent employees could be terminated only with "proper notice and investigation." The amendments to the handbook provided that "[p]ermanent employees are never dismissed without prior written admonitions and/or investigation that has been properly documented." Except in the case of extremely serious offenses the handbook required three warning notices before a permanent employee could be dismissed.

The contractual status of employee handbooks has been the subject of a great deal of litigation in recent years. Several courts have rejected the notion that an employee handbook or manual can ever create binding contractual obligations. (See, *e.g.*, *Uriarte v. Perez-Mo-*

*lina* (D.D.C. 1977), 434 F. Supp. 76 (applying D.C. law); *White v. Chelsea Industries, Inc.* (Ala. 1983), 425 So. 2d 1090; *Heideck v. Kent General Hospital, Inc.* (Del. 1982), 446 A.2d 1095; *Muller v. Stromberg Carlson Corp.* (Fla. App. 1983), 427 So. 2d 266; *Shaw v. S. S. Kresge Co.* (1975), 167 Ind. App. 1, 328 N.E.2d 775; *Johnson v. National Beef Packing Co.* (1976), 220 Kan. 52, 551 P.2d 779; *Richardson v. Charles Cole Memorial Hospital* (1983), 320 Pa. Super. 106, 466 A.2d 1084; *Reynolds Manufacturing Co. v. Mendoza* (Tex. Civ. App. 1982), 644 S.W.2d 536.) However, the overwhelming majority of courts considering the issue have held that an employee handbook may, under proper circumstances, be contractually binding. See, *e.g., Vinyard v. King* (10th Cir. 1984), 728 F.2d 428 (applying Oklahoma law); *Lincoln v. Sterling Drug, Inc.* (D. Conn. 1985), 622 F. Supp. 66 (Connecticut law); *Barger v. General Electric Co.* (W.D. Va. 1984), 599 F. Supp. 1154 (Virginia law); *Smith v. Teledyne Industries, Inc.* (E.D. Mich. 1984), 578 F. Supp. 353 (Ohio law); *Brooks v. Trans World Airlines, Inc.* (D. Colo. 1983), 574 F. Supp. 805 (Colorado law); *Leikvold v. Valley View Community Hospital* (1984), 141 Ariz. 544, 688 P.2d 170; *Pugh v. See's Candies, Inc.* (1981), 116 Cal. App. 3d 311, 171 Cal. Rptr. 917; *Salimi v. Farmers Insurance Group* (Colo. App. 1984), 684 P.2d 264; *Finley v. Aetna Life & Casualty Co.* (1985), 5 Conn. App. 394, 499 A.2d 64; *Jackson v. Minidoka Irrigation District* (1977), 98 Idaho 330, 563 P.2d 54; *Wyman v. Osteopathic Hospital of Maine, Inc.* (Me. 1985), 493 A.2d 330; *Staggs v. Blue Cross of Maryland, Inc.* (1985), 61 Md. App. 381, 486 A.2d 798; *Toussaint v. Blue Cross & Blue Shield* (1980), 408 Mich. 579, 292 N.W.2d 880; *Pine River State Bank v. Mettille* (Minn. 1983), 333 N.W.2d 622; *Enyeart v. Shelter Mutual Insurance Co.* (Mo. App. 1985), 693 S.W.2d 120; *Morris v. Lutheran Medical Center* (1983), 215 Neb. 677, 340 N.W.2d 388; *Southwest Gas*

*Corp. v. Ahmad* (1983), 99 Nev. 594, 668 P.2d 261; *Woolley v. Hoffman-LaRoche, Inc.* (1985), 99 N.J. 284, 491 A.2d 1257; *Forrester v. Parker* (1980), 93 N.M. 781, 606 P.2d 191; *Bolling v. Clevepak Corp.* (1984), 20 Ohio App. 3d 113, 484 N.E.2d 1367; *Langdon v. Saga Corp.* (Okla. Ct. App. 1976), 569 P.2d 524; *Yartzoff v. Democrat-Herald Publishing Co.* (1978), 281 Or. 651, 576 P.2d 356; *Osterkamp v. Alkota Manufacturing, Inc.* (S.D. 1983), 332 N.W.2d 275; *Hamby v. Genesco, Inc.* (Tenn. App. 1981), 627 S.W.2d 373; *Piacitelli v. Southern Utah State College* (Utah 1981), 636 P.2d 1063; *Thompson v. St. Regis Paper Co.* (1984), 102 Wash. 2d 219, 685 P.2d 1081; *Mobil Coal Producing, Inc. v. Parks* (Wyo. 1985), 704 P.2d 702.

This court has never specifically addressed the issue of employee handbooks. Our appellate court, however, has addressed the issue several times, with conflicting results. In *Carter v. Kaskaskia Community Action Agency* (1974), 24 Ill. App. 3d 1056, the court held that an employee manual, which was introduced after the employee began working and was written with input from the employees, created enforceable contractual rights. However, in *Sargent v. Illinois Institute of Technology* (1979), 78 Ill. App. 3d 117, the court distinguished *Carter* and held that the handbook in question was not binding because it was given to the employee when he first began work and was not specifically "bargained for." (78 Ill. App. 3d 117, 121-22.) Still another appellate decision, *Kaiser v. Dixon* (1984), 127 Ill. App. 3d 251, rejected *Sargent* and held that an employee manual may be binding notwithstanding that it was not "bargained for."

Federal courts applying Illinois law have reflected the split in our appellate court. Two Federal cases have followed *Sargent*. (See *Enis v. Continental Illinois National Bank & Trust Co.* (N.D. Ill. 1984), 582 F. Supp.

876; *Rynar v. Ciba-Geigy Corp.* (N.D. Ill. 1983), 560 F. Supp. 619.) However, since *Kaiser*, several Federal courts applying Illinois law have followed *Kaiser* as the better reasoned approach. See, *e.g., Pelizza v. Reader's Digest Sales & Service Inc.* (N.D. Ill. 1985), 624 F. Supp. 806; *Kufalk v. Hart* (N.D. Ill. 1985), 610 F. Supp. 1178; *Pudil v. Smart Buy, Inc.* (N.D. Ill. 1985), 607 F. Supp. 440.

Nearly all courts agree on the general rule, that an employment relationship without a fixed duration is terminable at will by either party. Those courts which hold that an employee handbook can never create enforceable job security rights appear to apply this general rule as a limit on the parties' freedom to contract. The majority of courts, however, interpret the general "employment-at-will rule" as a rule of construction, mandating only a presumption that a hiring without a fixed term is at will, a presumption which can be overcome by demonstrating that the parties contracted otherwise. We agree with the latter interpretation.

We find particularly persuasive the opinion of the Supreme Court of Minnesota in *Pine River State Bank v. Mettille* (Minn. 1983), 333 N.W.2d 622, which analyzed an employee handbook in terms of the traditional requirements for contract formation: offer, acceptance, and consideration (333 N.W.2d 622, 625). In *Pine River* an employee handbook was distributed to the plaintiff several months after he began working for defendant. (333 N.W.2d 622, 624.) The handbook contained a section entitled "Job Security" which described the generally secure nature of employment in the banking industry. (333 N.W.2d 622, 625-26 & 626 n.2.) The court held that this section of the handbook did not constitute an offer because it contained no definite promises. (333 N.W.2d 622, 630.) The handbook, however, also contained a section entitled "Disciplinary Policy," which stated that "[i]f an

employee has violated a company policy, the following procedure will apply ***" (333 N.W.2d 622, 626 n.3), followed by a step-by-step process of progressive discipline ending with "[d]ischarge from employment for an employee whose conduct does not improve as a result of the previous action taken" (333 N.W.2d 622, 626 n.3). The court held this to be a specific offer for a unilateral contract—the bank's promise in exchange for the employee's performance, *i.e.*, the employee's labor. (333 N.W.2d 622, 630.) By performing, the employee both accepted the contract and provided the necessary consideration, and thus the bank's dismissal of the plaintiff without the benefit of the progressive disciplinary procedures constituted a breach of the employment contract. 333 N.W.2d 622, 630-31.

Following the reasoning in *Pine River*, we hold that an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present. First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed.

Applying the above principles to the case at bar it is apparent that the document entitled "Employee Handbook" created an enforceable right to the particular disciplinary procedures described therein. The amended handbook states that "[a]t the end of 90 calendar days

since employment the employee becomes a permanent employee and termination contemplated by the hospital *cannot occur* without proper notice and investigation." (Emphasis added.) It states that permanent employees "*are never* dismissed without prior written admonitions and/or an investigation that has been properly documented" (emphasis added), and that "three warning notices within a twelve-month period *are required* before an employee is dismissed, except in the case of immediate dismissal." (Emphasis added.) The reservation as to "immediate dismissal" does not detract from the definiteness of the offer, because that term is well defined. An "immediate dismissal" justifies dismissal "without notice for a grave and valid reason," and the list of examples of grave offenses includes such offenses as "Mistreatment of a patient," "Fighting on hospital premises," "Unauthorized Possession of Weapons," and "Reporting to work under the influence of intoxicants." The handbook also lists offenses which are specifically *not* subject to immediate dismissal, such as "Deliberate Violation of Instructions," "Unwillingness to Render Satisfactory Service," and "Unauthorized Absence." An employee reading the handbook would thus reasonably believe that, except in the case of a very serious offense, he or she would not be terminated without prior written warnings. Furthermore, the handbook creates rights even for probationary employees who may be terminated "without notice but for just cause."

Moreover, the handbook contains no disclaimers to negate the promises made. In fact, the introduction to the handbook states just the opposite, that the policies in the handbook "are designed to clarify your *rights* and duties as employees." (Emphasis added.) Thus, the handbook language is such that an employee would reasonably believe that after the expiration of the initial probationary period the progressive disciplinary procedure

would be part of the employer's offer.

Finally, it is undisputed that defendant gave the handbook to plaintiff and intended that plaintiff become familiar with its contents. In fact, a significant part of plaintiff's duties as an employee consisted of instructing new employees on the contents of the handbook. There is no question but that plaintiff continued to work with knowledge of the handbook provisions. Under these circumstances the handbook's provisions became binding on the employer.

A more difficult question is whether or not defendant complied with the provisions of the handbook. It is undisputed that plaintiff had been working for more than 90 days and was receiving benefits only available to "permanent" employees. Defendant, however, claims that plaintiff had been transferred to a new position, and therefore reverted to probationary status. In support of this argument defendant cites an amendment to the handbook, finalized on September 3, 1981, which states that "[a]ll promotions and transferred employees must successfully pass a designated probationary period." This provision means, defendant argues, that once plaintiff had been transferred she could be terminated without the benefit of the progressive disciplinary procedures required for permanent employees.

We disagree. The handbook states that an employee may be terminated without notice during the *"initial* probationary period" (emphasis added), a period which ends "[a]t the end of 90 calendar days since employment." There is nothing in the policy statement on transfers to indicate that an employee serving a *"designated* probationary period" loses the right to progressive disciplinary procedures which vested when the employee successfully passed the *"initial* probationary period." (Emphasis added.) In addition, in distinguishing between "permanent" and "probationary" employees for discipli-

nary purposes the handbook notes that only "permanent" employees are eligible for employee benefits. It is undisputed that plaintiff continued to receive vacation pay and other benefits after the September 14, 1981, reorganization, as she had following her prior promotions. In fact, plaintiff's supervisors at the hospital claimed in their depositions that plaintiff, upon transfer, had occupied a hybrid "permanent probationary" status.

Moreover, the policy statement on transfers and promotions specifically states that its purpose is to "provide employees with approved promotional or transfer opportunities." The statement provides a procedure which begins with the posting of vacant positions and the employee's filing of a "Request for Transfer Form." The policy statement thus appears to apply only to *voluntary* transfers, and it is undisputed that plaintiff's transfer was not voluntary.

Ambiguous contractual language is generally construed against the drafter of the language (*Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill. 2d 105, 116; *Cedar Park Cemetery Association, Inc. v. Village of Calumet Park* (1947), 398 Ill. 2d 324, 333), and in the absence of evidence to the contrary we must conclude that the "designated probationary period" does not divest an employee of rights vested at the end of the "initial probationary period." We must also conclude that the designated probationary period applies only to employees who *request* transfer or promotion. It is clear that plaintiff's alleged infractions did not fit into the category of extremely serious offenses warranting "immediate dismissal," and it is undisputed the plaintiff did not receive the progressive disciplinary procedures normally required for permanent employees in a nonimmediate-dismissal situation. Since defendant can point to no reason why plaintiff would not be entitled to the progressive disciplinary procedures, other than the reasons we

have rejected above, we must agree with the appellate court that the failure to provide plaintiff with the required process violated her contractual rights.

Defendant also argues that the appellate court erred in granting summary judgment for plaintiff because the denial of plaintiff's motion for summary judgment was not a final and appealable order. Standing by itself the denial of a motion for summary judgment might not be final and appealable. However, when, as in this case, the trial court granted defendant's summary judgment motion as well as denying plaintiff's motion, the resulting order became final because it entirely disposed of the litigation. The cause was thus appealable in its entirety. Therefore it was not improper for the appellate court to reverse the denial of plaintiff's motion.

Finally, defendant argues that the appellate court erred in failing to allow oral argument. In support of this argument defendant cites *People v. Barker* (1974), 59 Ill. 2d 201. However, *Barker* merely held that the appellate court may not decide a case by summary order without the benefit of either briefing *or* oral argument. (59 Ill. 2d 201, 203-04.) In the case at bar the appellate court was fully briefed, and we can discern no rule, statute, or constitutional provision which creates a specific right to oral argument.

For the reasons stated above, the judgment of the appellate court is affirmed insofar as it reversed the orders of the circuit court. The cause is remanded to the circuit court of Cook County with directions to enter summary judgment for the plaintiff and for such further proceedings as are consistent with this opinion.

*Affirmed in part and remanded,*
*with directions.*