MARCIA G. FRANK, Plaintiff-Appellant, v. SOUTH SUBURBAN HOSPITAL FOUNDATION, Defendant-Appellee.

First District (2nd Division)   No. 1—92—4275

Opinion filed December 28, 1993.

Block, Krockey, Cernugel & Cowgill, P.C., of Joliet (Joseph M. Cernugel, of counsel), for appellant.

Vedder, Price, Kaufman & Kammholz, of Chicago (Michael G. Cleveland and Gary A. Chamberlin, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff Marcia G. Frank (Frank) brought this action against South Suburban Hospital Foundation (South Suburban), a not-for-profit Illinois corporation that operates South Suburban Hospital in Hazel Crest, Illinois, to recover damages resulting from the alleged wrongful termination of her employment as a nurse-supervisor. Cross-motions for summary judgment were filed, and the circuit court granted South Suburban's motion and denied Frank's motion. Frank now appeals. We affirm.

Frank was hired by South Suburban in October 1984 and became the nursing supervisor of South Suburban's oncology unit when it opened in January 1985. She had first become a registered nurse in Illinois in 1965, and had received her B.S. in 1982 and her M.S. in 1985. Frank had been employed previously at St. Elizabeth Hospital in Chicago, St. Margaret Hospital in Hammond, Indiana, and Ingalls Memorial Hospital in Harvey, Illinois.

As part of the hiring and orientation process, Frank received a letter of appointment dated September 25, 1984, and a notice of an orientation meeting. That notice advised her to attend the meeting with her "Employee Handbook" (Handbook). During her employment, two very similar versions of the handbook were in force. The personnel policies and procedures of South Suburban were distrib-

uted, and Frank kept these in a policy book at the nurses' station and in her office.

South Suburban characterizes the Employee Handbook as a general resource guide. The first page, entitled "Welcome," states that the Handbook is intended to provide employees with some "basic guidelines" about employee "rights and responsibilities" and South Suburban's structure. The third page, entitled "Foreword," states that the Handbook is a "general manual" only and may be revised at any time. A section of text set off from the rest of the page states that "[t]his handbook is a basic guide only. It is not a definitive policy or procedure manual. The hospital and its functional units maintain specific operating manuals, policies, procedures and rules." Employees are told that they "may also refer to the hospital's Personnel Policy and Procedure Manual."

The discipline section of the Handbook lists five "[t]ypes of disciplinary action that may be taken." These are first reprimand, second reprimand, one-day suspension, three-day suspension, and discharge. The Handbook specifies that "[t]he type of action will depend upon the severity of the offense and the corrective action deemed necessary by the direct supervisor." South Suburban's progressive discipline policy lists the same five examples of disciplinary action, any of which may be imposed depending upon the severity and circumstances of the offense. "Progressive discipline may begin or advance to any step omitting action at lesser step(s) dependent upon the severity of the employee infraction(s)." Discharge, in particular, may occur for "commission of a first infraction of a serious nature." The policy specifies that three-day suspensions "[m]ay be administered to an employee in lieu of immediate discharge pending investigation." The purposes and scope of the policy are listed as "[t]o define and specify the methods for administering discipline and to insure fair and consistent treatment of employees in violation of hospital policies and procedures." Finally, the progressive discipline operational practice standard procedure provides that the department manager or supervisor is to review the facts of the case and the disciplinary action with the employee, and to obtain the employee's signature on the disciplinary action form.

The employee behavior policy specifies that "[b]ehavior that requires disciplinary action includes, but is not limited to the following." Twenty-six examples follow, including "11. Deliberate failure to follow instructions or to work in accordance with hospital or department policies and procedures." This policy also specifies that "[t]he nature of the disciplinary action administered will be based on the nature of the incident." The medical leave of absence

policy provides that an employee may commence a leave of absence no later than the fifteenth day after being away from work for medical reasons. An employee must exhaust accumulated sick pay first, with the remaining time being unpaid. The duration of a leave is 30 to 180 days.

Another policy calls for annual reviews of performance, and Frank's first review in March 1985 was positive. At her next review in October 1985, she was given both positive and negative evaluations, and was awarded a pay increase of 5%, identified as representing a performance level "above expectations." In April 1986 she was awarded a 2% merit increase on top of a 4% across-the-board increase, for performing according to expectations. Her performance review of October 1986 also showed her performing according to expectations.

On March 17, 1987, a patient in the oncology unit experienced an erratic and accelerated heart beat. His pulse rate was 170 to 180, and the normal rate would be 60 to 100. A "stat EKG" was ordered by a nurse and approved by the patient's physician, Dr. Fanaipour, who ordered other tests as well. Another of the patient's physicians, Dr. Mehta, was contacted by telephone. He ordered that digoxin (the generic name for the product Lanoxin) be given, and it was. After the EKG and lab test results were received, Dr. Mehta ordered the administration of more digoxin intravenously.

At this point Frank intervened. She noted from the patient's chart that in the past he had been given digoxin, and became concerned that he might be "digtoxic," meaning that he had too much digoxin in his system. She called the laboratory and ordered that a digoxin level test be performed on blood already taken from the patient. Before the results of the test were available, Frank observed a staff nurse preparing to inject the additional digoxin ordered by Dr. Mehta. She directed the nurse not to administer the drug until the digoxin level test had been completed. Additionally, Frank performed a medical procedure known as carotid massage on the patient. This procedure is designed to lower the heart rate and should generally be performed only on a patient who is being monitored. The patient in question was not monitored. Frank did not know whether or not the patient was in a life-threatening condition. When Dr. Mehta arrived on the floor and learned that the digoxin he had ordered had not been administered, he became upset and wanted to know why Frank had interfered with his orders. Frank was immediately suspended for three days pending investigation, in lieu of immediate discharge.

When the three-day investigatory suspension expired, Frank was

not returned to work. South Suburban placed her on paid sick leave status in order to obtain a medical evaluation of her condition, and considered placing her on a medical leave of absence in early April 1987 if her medical condition so warranted. Frank received sick pay for the time between the conclusion of her suspension and her termination.

Dr. Jay Walther examined Frank on March 24, 1987. Based on that examination and the results of laboratory tests he had ordered, Walther determined that Frank, in fact, had no significant health problems. On March 30, 1987, South Suburban terminated Frank, effective the following day, due to her actions on March 17 and the management deterioration which had occurred in her unit. Frank's signature appears on the disciplinary action form, under her notation "Signature signifies reading above only. Am in disagreement—charges not true."

Frank filed suit against South Suburban for wrongful discharge on July 10, 1987. Discovery proceeded for five years, and on September 21, 1992, the circuit court heard arguments on motions *in limine* presented by South Suburban. By agreement of both parties, South Suburban was granted leave to file a motion for summary judgment. The court entered the order on September 23, 1992. Pursuant to the court's order, South Suburban filed its motion on September 30, 1992. At the same time she filed her opposition to South Suburban's motion, Frank filed her own motion for summary judgment without leave of court. The court granted South Suburban's motion, ruling on the narrow issue that the Employee Handbook and policies did not constitute a clear promise to form an employment contract. The court denied Frank's motion and, because its ruling on South Suburban's motion was dispositive, did not rule on the other issues presented in the motion.

The circuit court determined that the policies and procedures in this case granted South Suburban discretion over what discipline is administered. The court stated:

> "[I]t is left to the discretion of South Suburban Hospital, while they must indulge in progressive discipline, where to begin or how to advance.

> * * *

> The progressive discipline policy, therefore, when one reads it in its totality, is—while it might be mandatory, the manner in which it is administered may skip steps, take more than one step, and you may also discharge for the commission of a first infraction."

Frank now appeals from the circuit court's granting of summary judgment in favor of South Suburban, and from its denial of her motion for summary judgment.

Section 2—1005 of the Illinois Code of Civil Procedure, dealing with summary judgment, states:

"The judgment sought shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (735 ILCS 5/2—1005(c) (West 1992).)

The standard of review of an order granting or denying summary judgment is *de novo*; a reviewing court will reverse an order granting summary judgment if it determines that an issue of material fact exists, or that the moving party is not entitled to judgment as a matter of law. *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 450 N.E.2d 1286.

The only issue in this case is whether there is a genuine issue of material fact as to whether the Employee Handbook and policies provided to Frank upon her employment created contractual rights giving her employment status that could not be terminated at the will of South Suburban. Frank argues that the Employee Handbook, the progressive discipline policy, the medical leave of absence policy, and the employee behavior policy separately and in unison formed the required contract. South Suburban asserts that they do not.

■ The Illinois Supreme Court in *Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 505 N.E.2d 314, set out for the first time the requirements which must be met in order for an employee manual or policy to create enforceable rights for an employee. The three-prong test established there requires:

"First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." *Duldulao*, 115 Ill. 2d at 490.

■ The circuit court in this case determined that the first *Duldulao* element was not satisfied. The second and third elements were not considered. We will therefore first consider, in determining whether South Suburban's motion for summary judgment was

properly granted, whether the language of the policy statement contains a promise clear enough that an employee would reasonably believe that an offer has been made.

In *Duldulao*, the Illinois Supreme Court noted that "the handbook contains no disclaimers to negate the promises made. In fact, the introduction to the handbook states just the opposite, that the policies in the handbook 'are designed to clarify your *rights* and duties as employees.'" (Emphasis in original.) (*Duldulao*, 115 Ill. 2d at 491.) This is at least reminiscent of the language of the introduction in this handbook, which provides that the employee's "rights and duties in the health care partnership are described briefly." Further, although the handbook itself contains what might be labeled a disclaimer ("This handbook is a basic guide only. It is not a definitive policy or procedure manual"), the sentence following the disclaimer ("The hospital and its functional units maintain specific operating manuals, policies, procedures and rules") arguably establishes South Suburban's written policies and procedures as "a definitive *** manual." This is quite possibly a clear enough promise that an employee could reasonably have believed that an offer had been made that South Suburban would operate its personnel procedures in conformity with the written policies and procedures it would disseminate to its employees.

The handbook at issue in *Duldulao* contained contractually binding language which clearly promised that "permanent" employees "*are never* dismissed without prior written admonitions," and that "three warning notices within a twelve-month period *are required* before an employee is dismissed." (Emphasis in original.) (*Duldulao*, 115 Ill. 2d at 490-91.) In this case, South Suburban's documents contain no parallel language. The Employee Handbook and the policies at issue merely describe some conduct that may subject an employee to discipline and list certain types of disciplinary action that might be taken. There is no promise to follow a course of progressive discipline in every situation prior to termination; in fact, the Handbook and policies at issue expressly state that the type of discipline depends entirely upon the severity of the offense, as determined by the employee's supervisor. There is no ambiguity about this contract language at all, despite Frank's assertions to the contrary.

In a recent case, this court has held that a handbook or policy manual which contains a disclaimer and additionally does not promise to apply progressive discipline in all situations does not constitute a contract. In *Semerau v. Village of Schiller Park* (1991), 210 Ill. App. 3d 493, 569 N.E.2d 183, *appeal denied* (1991), 141 Ill. 2d 560,

580 N.E.2d 135, the court held that no contract was formed where progessive discipline was merely recommended but not mandatory:

"[T]he manual stated that disciplinary action 'may include' suspension, dismissal, demotion, or other actions, and that disciplinary action 'should generally be progressive in severity.' Thus, the personnel policy manual suggested, but did not mandate, certain specified grounds and procedures with respect to disciplinary actions against an employee." *Semerau*, 210 Ill. App. 3d at 497-98.

Similarly, the United States District Court for the Central District of Illinois held in *Shepley v. E.I. Du Pont de Nemours & Co.* (C.D. Ill. 1989), 722 F. Supp. 506, that statements very similar to the language at issue here did not create a contract. The court said:

"Under *Duldulao*, where a disciplinary procedure is expressly not mandatory and does not contain definitive language requiring its use under the facts before it, there can be no clear promise of such a procedure and thus no contractual rights.

This Court finds that the [defendant's] Disciplinary Policy expressly allows for immediate discharge and the bypassing of other disciplinary actions and that the policy contains a nonexhaustive list of offenses which may result in immediate termination. ***

Because the Disciplinary Policy expressly provided that progressive discipline was not mandatory and expressly provided a nonexclusive list of terminable offenses, there was no contract between Plaintiff and Defendant requiring progressive discipline." *Shepley*, 722 F. Supp. at 511.

As the quoted language from *Semerau* and *Shepley* demonstrates, a handbook or policy which provides that progressive discipline "may" be used, but allows for discharge on the first offense for certain serious conduct, does not mandate progressive discipline. Similarly, in *Lee v. Canuteson* (1991), 214 Ill. App. 3d 137, 573 N.E.2d 318, *appeal denied* (1991), 141 Ill. 2d 543, 580 N.E.2d 117, the court found such language to be discretionary, stating:

"[T]he employee handbook states, '*** a progressive discipline approach *may* be used.' (Emphasis added.) This language clearly gave discretion to [the employer] to use progressive discipline or not in any given case as it saw fit, and so could not be construed as a promise to always use progressive discipline." *Lee*, 214 Ill. App. 3d at 143.

In *Rudd v. Danville Metal Stamping Co.* (1990), 193 Ill. App. 3d 1009, 550 N.E.2d 674, *appeal denied* (1990), 132 Ill. 2d 554, 555 N.E.2d 385, the court found no clear promise always to apply progressive discipline in handbook language which stated that "[v]iolations will be

grounds for progressive disciplinary action, which *may* include a correction interview, written warning, probation, suspension without pay, *or* termination." (Emphasis in original.) *Rudd*, 193 Ill. App. 3d at 1010. See also *Campbell v. Champaign* (7th Cir. 1991), 940 F.2d 1111, 1112-13 (handbook statement endorsing the concept of progressive discipline but allowing discharge for a serious offense is "too loose and vague to confer a legally enforceable right to such progressivity"); *Boulay v. Impell Corp.* (7th Cir. 1991), 939 F.2d 480, 482 (human resources manual which merely suggested pre-termination procedures was not a promise always to use those specific procedures).

In other cases, this court has also held that handbooks or policies which allow termination on the first infraction of a serious nature do not constitute a binding promise always to use progessive discipline. See *Williams v. Chicago Housing Authority* (1991), 217 Ill. App. 3d 1055, 578 N.E.2d 71; *Lampe v. Swan Corp.* (1991), 212 Ill. App. 3d 414, 571 N.E.2d 245.

Frank cites *Mitchell v. Jewel Food Stores* (1990), 142 Ill. 2d 152, 568 N.E.2d 827, for the proposition that language similar to the language in this case is sufficient to meet the *Duldulao* test. In that case, however, an employee handbook stated that during the first 90 days of employment, "an employee may be discharged for any reason at the sole discretion of the employer," and that after 90 days, an "employee shall not be *** discharged *** without just cause." Just cause included, among other things, "misconduct." (*Mitchell*, 142 Ill. 2d at 156-57.) Because of the clear promise not to discharge after 90 days except for just cause, there was a genuine issue of material fact as to whether the employee's conduct amounted to misconduct allowing for discharge. In *Mitchell*, summary judgment was thus inappropriate. In this case, however, South Suburban's policies and procedures contain neither such language, nor a probationary period which makes any substantive distinction in the administration of discipline.

Similarly, in *Seehawer v. Magnecraft Electric Co.* (N.D. Ill. 1989), 714 F. Supp. 910, the employee handbook stated that "employees shall be discharged or disciplined only for just cause." Summary judgment was again inappropriate, since the determination of whether or not just cause existed was a question of fact.

In *Perman v. ArcVentures, Inc.* (1990), 196 Ill. App. 3d 758, 554 N.E.2d 982, the court found that disclaiming language in the personnel policies was not enough to keep those policies from creating enforceable contract rights. In *Perman*, as in this case, the manual provided that employees were subject to dismissal for a first-time offense, but in *Perman*, unlike in this case, mandatory grievance

procedures were in place. The *Perman* court viewed the existence of grievance procedures as implying by their existence the creation of rights intended to be protected. *Perman*, 196 Ill. App. 3d at 765-66.

In *Long v. Tazewell/ Pekin Consolidated Communication Center* (1991), 215 Ill. App. 3d 134, 574 N.E.2d 1191, the court found that a handbook that detailed certain mandatory disciplinary steps for poor performance or rule violations formed a binding contract despite a disclaimer. The manual contained language that a position could be terminated at any time, but there was no language reserving the employer's right to discharge an employee on the first offense, or to determine the appropriate level of discipline in its own discretion. *Long*, 215 Ill. App. 3d at 138-39.

Finally, in *Belsanti v. CFS Holdings, Inc.* (1992), 260 Ill. App. 3d 419, *appeal denied* (1993), 149 Ill. 2d 647, 612 N.E.2d 510, the court held that a stated policy to discharge employees only where there is reasonable cause, and to help employees correct their performance "when appropriate" through a detailed sequence of techniques, was clear and definite enough to form a contractual promise to employees. Neither of those factors appears in this case.

Illinois courts construing language like that contained in South Suburban's policies and procedures have repeatedly and consistently found that it does not create a binding contract under *Duldulao*. We therefore hold that this language does not create a binding agreement in this case, and that the circuit court's granting of summary judgment to South Suburban was correct because the first prong of the *Duldulao* test was not met.

Even if this court were to determine that all three prongs of *Duldulao* had been met, and that a contract existed between Frank and South Suburban, at most the contract would be that South Suburban would adhere to the policies and procedures it had distributed to its employees. Since those policies and procedures provide for South Suburban's complete discretion in the implementation of the progressive discipline procedure, however, and since South Suburban followed its policies exactly in this case, discharging Frank for a first infraction of a serious nature at the discretion of her supervisor, the granting of South Suburban's motion for summary judgment would still have been appropriate. Frank's arguments that the alleged contract contained promises that discipline would be employed only where warranted, that any discipline *must be* progressive, and that discipline must be fairly and consistently enforced are contradicted by the language of the policies and procedures. That the charges were reviewed with Frank, as required by the policies and procedures, is attested to by Frank's signature on the disciplinary action form.

370

Finally, Frank's contention that a medical leave of absence was used as an involuntary means of discharge is unfounded; the record makes it clear that Frank was never placed on a medical leave of absence. She was terminated before the proposed medical leave could begin.

As the circuit court correctly found, there was no genuine issue of material fact in this case, and South Suburban was entitled to judgment as a matter of law. Accordingly, the circuit court properly dismissed Frank's motion for summary judgment.

For the reasons given above, we affirm the judgment of the circuit court.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.