Fourth Division

September 24, 1998

No. 1-97-3893

JAMES P. McTIGUE, )  APPEAL TO THE

)  CIRCUIT COURT OF

Petitioner/Plaintiff-Appellant, )  COOK COUNTY.

)

   v. )

)

PERSONNEL BOARD OF THE CITY OF CHICAGO; )

CHICAGO DEPARTMENT OF GENERAL SERVICES; )

THE CITY OF CHICAGO; THE REVEREND LUCIUS)

HALL, Chairman of the Personnel Board of)

The City of Chicago; TIMOTHY J. JOHNS,  )

Board Member of the Personnel Board of  )

the City of Chicago; ROBERT G. GIBSON,  )

Board Member of the Personnel Board of  )

the City of Chicago; and BENJAMIN REYES,)

Commissioner of the Department of     )

General Services, all named solely in   )

their official capacities,     )  HONORABLE

)  STEPHEN SCHILLER,

Respondents/Defendants-Appellees   )  JUDGE PRESIDING.

JUSTICE WOLFSON delivered the opinion of the court:

Few Chicagoans will forget that morning in April 1992 when a section of the underground freight tunnel gave way and the river flooded into the tunnel, then into basements and sub-levels of numerous "loop" buildings, including City Hall.  The flood affected electric service, telephone service, and the sewer system.  Workers had to be sent home.  The City's downtown area was crippled.

Inquiries immediately began to determine how and why this tragedy occurred and what could have been done to avoid it.  One result of that inquiry was the discharge of City employee James P. McTigue.  This case is a review of that administrative decision.  We conclude McTigue should not have been discharged. 

FACTS

In January 1992, McTigue had been a City employee for nearly 10 years.  He was assigned to the Department of General Services and held the title of Engineering Technician V.  Though McTigue had several duties, one of his functions was "resident engineer" of the Chicago Freight Tunnel, a tunnel (once 62 miles long) which runs beneath much of the loop area of Chicago.  The tunnel has no lighting.  Portable lighting, such as flashlights or miners' hats, are required to see inside the tunnel.  Many areas are damp and muddy.

McTigue described his responsibilities with regard to the tunnel:

"I received weekly reports on the condition of our pumps in various strategic locations in the tunnel.  The City electrician would go around once a week and inspect the pumps.  If everything was working properly, they would call me and tell me everything was okay.  If there was a problem, I would go down and inspect the problem, determine the solution and bring in the people to take care of the problem.

Also, I inspected -- I looked over plans for installations of fiber optics, cable tv, telecommunications, Illinois Bell Telephone, and Commonwealth Edison.  And I was involved in approving plans and making sure that installations were put in according to specifications."

McTigue said he generally did not enter the tunnel unless he had a purpose.  It was uncontradicted that the Department of General Services, for which McTigue worked, had neither the responsibility nor the resources to repair or maintain the tunnels.

In either late January or early February, McTigue said, a Chicago Cable worker told him about a possible problem in the tunnel -- what appeared to be a cave-in in the tunnel near Kinzie, east of Kingsbury.  Shortly after receiving this information, McTigue said, he inspected the tunnel in the area mentioned.  He found no cave-in.  He did find an old breach east of Kingsbury, near Hubbard, where a piling had been driven into the ground and had broken through the tunnel.  This old breach had already been repaired and was unrelated to the April flood.

Later, on February 26, 1992, McTigue saw some Chicago Cable workers while he was in the tunnel working on an unrelated matter.  Again, the cable workers mentioned a cave-in on Kinzie, east of Kingsbury.  McTigue told them he had inspected the area and found nothing.  He asked the cable installers to call him the next day with more details on the location of the problem.  McTigue said he never heard from Chicago Cable again and he took no further action until March 13, 1992.

There is nothing in McTigue's work diary regarding the reports he received in January and/or February about a cave-in.  Nor is there anything in the diary to support McTigue's statement that he inspected the area near Kinzie, east of Kingsbury, after being notified of such a problem.

McTigue's diary does reflect, however, that he entered the tunnel on Friday, March 13, 1992.  On this day, McTigue was accompanied by Tim Linder and Eric Grundke from Kiewitt, a company installing fiber optics in the tunnel.  After inspecting installation work done by Kiewitt, McTigue said, he asked Linder and Grundke to accompany him while he looked for a possible cave-

in near Kinzie.  While proceeding on Kinzie, they continued on past Kingsbury.  The tunnel makes some 45-degree bends in this area.  After rounding two bends, McTigue discovered a cave-in of the north face of the tunnel wall at Kinzie, approximately 340 feet west of Kingsbury.  The hole in the wall was approximately four feet wide and 10 feet long.  Mud and "silt" had flowed into the tunnel.  A thorough inspection of the hole could not be conducted because so much silt was present McTigue couldn't get within 10 feet of the hole.

Back at the office, either that same day or early the following Monday, March 16, 1992, McTigue plotted the position of the breach against maps he had of the tunnels and determined the breach was located in a part of the tunnel which ran under the river.  McTigue reported the situation to his supervisor.

On March 17, 1992, McTigue was able to reach Tim Later, head of the Department of Transportation, and Ted Maynard, Chief Soils Engineer, to notify them of the breach. 

On March 18, 1992, McTigue accompanied Assistant Soils Engineer Chawla to the breach site.  McTigue took pictures of the breach in the tunnel wall, which on closer inspection revealed a void that extended back about 12 feet, exposing old and new pilings.  Water was seeping in.

An inspection from above indicated that new support pilings had been driven into the ground in connection with the Kinzie Street Bridge project, which had begun in September, 1991.

On March 25, 1992, Linder went with McTigue to Tim Later's officer regarding another matter.  In the course of the conversation, a discussion began on possible solutions to the tunnel cave-in problem.  Later said, "I don't want to hear anything about that."

McTigue and Linder left Later's office and proceeded to Maynard's office.  While speaking with Maynard, again the conversation turned to the tunnel wall cave-in.  Maynard cut off the discussion, saying, "Don't worry about it, it's too far under the river for anything to happen."

On April 1, 1992, the City's Chief Engineer and other high-

ranking employees from the Department of Transportation met to determine what should be done about the tunnel breach.  McTigue was the only employee from the Department of General Services to attend the meeting.  After much discussion it was decided that bulkheads should be installed to isolate the area around the breach.  The installation of these bulkheads was to be contracted out.  Arrangements were then made to solicit bids on the project.

  According to McTigue's supervisor, after the breach was discovered in March 1992, McTigue's responsibility with regard to the tunnel centered around providing guide service for persons wishing to enter the tunnel.  

On April 13, 1992, the breach ruptured.  The river flooded into the tunnel and the sub-levels of loop-area buildings.

Procedural Background

On April 16, 1992, McTigue was brought to the offices of the City's Deputy Corporation Counsel.  He was questioned about his discovery of the tunnel breach and his conduct after the discovery was made.  He was questioned about entries to his work diary and a hand-written report found on his desk after the flood.

Soon after, McTigue was notified that his discharge was being considered.  He was given a "Statement of Charges" in which he was told he had violated Personnel Rule XVIII, section 1, subparagraphs 8, 29, 36, 39, and/or 50.

The charges:

"1. You failed to conduct an appropriate investigation after being notified in February, 1992, of a "cave-in" in the City's freight tunnel, thereby performing your duties in a careless and incompetent manner.

2. You failed to promptly inspect and/or evaluate the freight tunnel in March, 1992.

3. You filed a false report in connection with the investigation of the crack and/or cave-in in the freight tunnel."

McTigue provided a written response to these charges.  After reviewing the charges and McTigue's response, the head of the Department of General Services, Commissioner Benjamin Reyes, notified McTigue in a letter dated May 5, 1992, that the decision had been made to discharge him effective May 6, 1992.

McTigue sought review of the discharge by filing a petition for a hearing with the Personnel Board of the City of Chicago.  Beginning June 11, 1992, a series of hearings was held.  On October 5, 1992, a hearing officer issued a report recommending  McTigue's discharge be upheld.  The hearing officer made no specific findings as to which personnel rules had been violated.

Two days later, on October 7, 1992, the Personnel Board issued its decision to uphold McTigue's discharge
 according to the Hearing Officer's recommendations.

On November 20, 1992, McTigue petitioned the circuit court of Cook County for a Writ of Certiorari, asking the court to review and set aside the Personnel Board's decision to uphold his discharge.

On May 6, 1994, Judge John M. Hourihane reversed the Board's decision and remanded the matter for a new hearing.  In passing judgment, Judge Hourihane remarked:

"In a statement of charges it was indicated that the plaintiff was in violation of Personnel Rule 18 Section 1 Subparagraphs 8, 29, 36, 39, and/or 50.  Of the charged violations only Section 8, making false, inaccurate, or deliberately incomplete statements in an official inquiry, investigation, or other proceeding, authorizes discharge for the first offense."

The court then found it was error for the Personnel Board to have upheld McTigue's discharge based on allegedly false statements made to the Deputy Corporation Counsel.  McTigue never had been charged with making false statements to investigators.

A second hearing was held before another hearing officer.   On January 9, 1995, this hearing officer reported to the Personnel Board:

"The evidence established that Respondent violated Personnel Rule XVIII, Section 1, Subparagraphs 8, 29 and 39.  Accordingly, Respondent's discharge should be upheld."

Subparagraph 8 states:

"Making false, inaccurate or deliberately incomplete statements in an official inquiry, investigation or other official inquiry."

Subparagraph 29 states:

"Failing to take action as needed to complete an assignment or perform a task safely."

Subparagraph 39 states:

"Incompetence or inefficiency in the performance of the duties of the position.  This means performance of the duties of the position at a level lower than that ordinarily expected of other employees in similar positions, due either to lack of ability, knowledge, or fitness, lack of effort or motivation, carelessness, or neglect."

On January 26, 1995, the Personnel Board, once again, adopted the hearing officer's findings and recommendation.  McTigue's discharge, based on violation of the three personnel rules cited above, was affirmed.

McTigue filed a Petition for a Writ of Certiorari with the circuit court of Cook County for review of the Board's decision.  On June 3, 1997, Judge Steven A. Schiller found the evidence did not support a finding that McTigue's conduct 
after
 March 13, 1992, violated any personnel rule.  Also, the court said there was no evidence McTigue ever filed a false report.  The court remanded the case to the Board to consider whether McTigue's violation of subparagraphs 29 and 39 warranted discharge or some other discipline.

The Personnel Board affirmed McTigue's discharge for the third time.

On September 17, 1997, the trial court heard argument on McTigue's motion to reconsider, as well as his petition to reverse the Board's most recent decision to uphold the discharge.  Judge Schiller found the Personnel Rules allowed for dismissal, even for first-time violations of subparagraphs 29 and 39.  The circuit court affirmed McTigue's dismissal.

McTigue filed this timely appeal.

DECISION

McTigue asks this court to consider three issues: (1) whether the Board's finding that McTigue violated Rule XVIII, Section 1, subparagraphs 29 and 39 was against the manifest weight of the evidence; (2) even if McTigue did violate these sections, whether the Personnel Rules of the City of Chicago provide for dismissal of an employee for a first-time violation of subparagraphs 29 and 39; and (3) if discharge is available, whether the standard to be used by the Board to determine "cause" for discharge is the "just cause" standard required by the collective bargaining agreement.

1. 
Manifest Weight

We first address the Personnel Board's finding that McTigue violated subparagraphs 29 and 39.  Based on Judge Schiller's June 3, 1997, order, that McTigue's conduct 
after
 March 13, 1992, violated none of the personnel rules, our review is limited to a consideration of whether it was against the manifest weight of the evidence for the Board to have found that McTigue's conduct 
prior
 to March 13, 1992, violated rules 29 and 39.  See 
Walsh v. Board of Fire & Police Comm'rs
, 96 Ill. 2d 101, 449 N.E.2d 115 (1983)(an administrative agency's findings will be upheld unless they are against the manifest weight of the evidence).  An administrative finding is against the manifest weight of the evidence only if no rational trier of fact could agree with the determination, viewing the evidence in a light most favorable to the agency.  
Chief Judge of Circuit Court v. AFSCME, Council 31
, 153 Ill. 2d 508, 514, 607 N.E.2d 182 (1992).  We do not reweigh the evidence or substitute our own opinion.  
Pundy v. Department of Professional Regulation
, 211 Ill. App. 3d 475, 483, 570 N.E.2d 458 (1991).

It is true, as McTigue points out, the only evidence regarding his conduct in relation to the tunnel prior to March 13, 1992, came from his own testimony.  Though there are no notations in his work diary, McTigue said he was told by cable installers, in late January or early February, there was a cave-

in in the tunnel on Kinzie, 
east
 of Kingsbury.  He said he immediately inspected the area and found nothing.  Again, he received notification about a cave-in on February 26, 1992.  He took no action because the cable installers failed to call him with more details about the location.  It wasn't until March 13, 1992, when McTigue, on his own initiative, he says, inspected the tunnel 
west
 of Kingsbury and discovered the breach.

The Board found from the evidence presented that McTigue "failed to take action as needed" (subparagraph 29) and "was incompetent or inefficient in the performance of his duties due to neglect" (subparagraph 39).  By his own admission, McTigue first learned of a possible breach in the tunnel as early as mid-

January 1992.  He made an inspection, but didn't go far enough.  When told a second time, McTigue took no action for at least two weeks.  Under these circumstances, we reluctantly conclude the Board's conclusion that McTigue violated Rule XVIII, section 1, subparagraphs 29 and 39, while resting on a thin foundation, is not against the manifest weight of the evidence.

2. 
Availability of discharge under the Personnel Rules

We now consider whether dismissal is an available discipline for a first-time violation of subparagraphs 29 and 39.

The City of Chicago Personnel Rules handbook states:

"
Rule XVIII  - Disciplinary Actions and Procedures for 

Career Service Employees
  

Section 1 - Causes for Action

The City of Chicago has an interest in promotion order and general welfare of all employees [sic], as well as the general public.  The City of Chicago, a public employer, requires that its employees perform their duties in a manner which furthers the efficiency and best interests of the City, and which results in the highest level of public trust and confidence in municipal government.

The department head has the authority and responsibility to take disciplinary action against any employee whose conduct does not further the efficiency and best interests of the City of Chicago.  The degree of discipline to be meted out is dependent on various factors, including, but not limited to, the seriousness of the offense, the employee's work record and the totality of the circumstances.  The following conduct, discussed below, when engaged in by an employee, will result in disciplinary action unless the employer, taking all circumstances into account, deems it to be excusable.  
Conduct denoted with an asterisk may result in discharge action for the first offense under appropriate circumstances as described below.

As with all the Personnel Rules, it should be noted that if an employee is covered by a collective bargaining agreement, that agreement shall govern in the event of a conflict between any part of this Rule and any such agreement.  Employees covered by such agreement can only be discharged for just cause."  (Emphasis added.)

After these introductory paragraphs, the section breaks down into 50 subparagraphs, each listing an example of conduct which could result in disciplinary action.  Thirty-six of the 50 subparagraphs are preceded by an asterisk.  Eight of those 36 subparagraphs contain additional qualifying conditions in capital letters; for example, subparagraph 2: 

"2.  Leaving the department, office, or work site with-

out proper authorization.  DISCHARGE FOR FIRST

OFFENSE APPLICABLE ONLY WHERE THE HEALTH, SAFETY

OR WELFARE OF A PERSON IS ENDANGERED."

The obvious intent of section 1 is to distinguish between grave or serious misconduct on the one hand, and minor or trivial violations on the other.  The distinguishing mark is the asterisk.  For instance, absenteeism and tardiness that endanger someone's health, safety, or welfare bear the asterisk.  So do "MISREPRESENTATIONS" and "CRIMINAL OR IMPROPER CONDUCT," categories involving wilful or criminal behavior of a serious kind.  It is when the subparagraphs reach "CONDUCT INVOLVING JOB PERFORMANCE" that the asterisks begin to fall away, attaching only to serious violations, such as failing to live in the City of Chicago or violating the City's ethics ordinance.

The two subparagraphs which McTigue ultimately was found to have violated, subparagraphs 29 and 39, are 
NOT
 preceded by an asterisk.  McTigue contended in the circuit court, and still maintains, the absence of an asterisk before a subparagraph indicates discharge is not an available disciplinary measure when the employee is found to have violated the provision for the first time.

The Personnel Board disagreed and the circuit court affirmed, finding a department head has the authority and discretion to dismiss an employee for a first-time violation of any subparagraph, whether or not it is preceded by an asterisk.  In reaching this ruling, the circuit court relied on section 2 of Rule XVIII, entitled "Progressive Discipline."  This section provides:

"The City of Chicago approves of the concept of progressive and corrective discipline for Career Service Employees and recommends its use when appropriate.  Progressive discipline is a systematic approach to correct unwanted behavior and deterring its occurrence by administering disciplinary actions based upon various factors, including but not limited to, the severity of the infraction, the number of times it has occurred, and the totality of the circumstances surrounding the misconduct.  The City of Chicago uses progressive discipline in its discretion and does not solely rely on this concept in every instance when taking disciplinary action.

While it is not possible to list every act which will or might result in disciplinary action, 
actions itemized above reflect conduct which is deemed to be inappropriate and which may result in disciplinary action.  The list is not exhaustive, but is offered instead to generally provide notice of inappropriate conduct.  Supervisors may deem that conduct other than that itemized above is improper and warrants discipline.  Further, the department head, or his/her designee, has the discretion to determine what degree of discipline is appropriate after weighing all the situational factors involved in the misconduct." 

This court must interpret the Personnel Rules and decide the significance, if any, of the asterisk preceding certain subparagraphs, but not others.  The parties are unable to cite to any caselaw directly on point.  We cannot find any.  

This is not a case where we have to decide whether the regulations constitute an enforceable employment contract.  The City agrees they do.  Our task is to determine the meaning of the regulations.

Our review of the Personnel Board's interpretation of its rules is 
de novo
 (
Peerless Wholesale Liquors, Inc. v. Illinois Liquor Control Comm'n
, 296 Ill. App. 3d 230, 233, 694 N.E.2d 620 (1998)), though we give the administrative agency's interpretation of its rules considerable deference (
Mattis v. State Universities Retirement System
, 296 Ill. App. 3d 675, 679, 695 N.E.2d 566 (1998)).  The agency's interpretation is not binding if this court finds it to be erroneous.  
Denton v. Civil Service Comm'n
, 176 Ill. 2d 144, 148, 679 N.E.2d 1234 (1997).

In general, rules courts use to construe statutes also apply to the interpretation of municipal ordinances. 
In re Application of County Collector
, 132 Ill. 2d 64, 547 N.E.2d 107 (1989); 
McArdle v. Rodriguez
, 277 Ill. App. 3d 365, 659 N.E.2d 1356 (1995).  The parties agree the City's Personnel Rules, promulgated under the authority of Chicago's Municipal Code, have the force and effect of law and must be construed using the same standards used when construing statutes.  See 
Northern Illinois Automobile Wreckers and Rebuilders Ass'n v. Dixon
, 75 Ill. 2d 53, 387 N.E. 2d 320 (1979)(administrative rules and regulations have the force and effect of law and must be construed under standards governing construction of statutes).

The cardinal rule when construing statutes is to ascertain and give effect to legislative intent.  
Cummins v. Country Mutual Insurance Co.
, 178 Ill. 2d 474, 478, 687 N.E.2d 1021 (1997).  The best indicator of intent is the plain and unambiguous language of the statute.  
Opyt's Amoco, Inc. v. South Holland
, 149 Ill. 2d 265, 277, 595 N.E.2d 1060 (1992).  Where the language of the statute is plain, it is not the court's function to search further for some "subtle or not readily apparent" intent.  
DiFoggio v. Retirement Board of the County Employees Annuity & Benefit Fund
, 156 Ill. 2d 377, 383, 620 N.E.2d 1070 (1993).  "A court is not free to rewrite legislation, or to ignore an express requirement contained in a statute."  
People v. Palmer
, 148 Ill. 2d 70, 88, 592 N.E.2d 940 (1992).

When interpreting a statute, a court may not read into the statute a limitation not enacted by the legislature, nor can it read out of the statute, "by subtle construction or otherwise," a limitation which the legislature enacted.  
Palmer
, 148 Ill. 2d at 85.  No sentence, clause, or word should be interpreted in a way that renders it superfluous or meaningless.  
People v. Bartlett
, 294 Ill. App. 3d 435, 690 N.E.2d 154 (1998); 
Warren v. Borger
, 184 Ill. App. 3d 38, 539 N.E.2d 1284 (1989).  If two interpretations are possible, the one that gives all words in the statute some meaning will be the one that is more reasonable.  
People v. Bartlett
, 294 Ill. App. 3d at 439.  It should be remembered, too, "*** there is no canon against using common sense in construing laws as saying what they obviously mean."  
Johnson v. Partee
, 105 Ill. 2d 186, 473 N.E.2d 944 (1984), quoting 
Roschen v. Ward
, 279 U.S. 377, 339, 73 L. Ed. 722, 728, 49 S. Ct. 336 (1929).

Citing to 
Frank v. South Suburban Hospital Foundation
, 256 Ill. App. 3d 360, 628 N.E.2d 953 (1993), the City contends McTigue's dismissal was proper because "a handbook or policy which provides that progressive discipline 'may' be used, but allows for discharge on the first offense for certain serious conduct, does not mandate progressive discipline."

The issue in this case, however, is not whether progressive discipline is mandated, regardless of the violative conduct.  McTigue does not claim discharge never can be imposed for a first offense.  The Personnel Rules clearly provide for the possibility of dismissal for first offenses in certain instances, as did the employee manual in 
Frank
.

The question here is whether the City, by the language it used in section 1 of Personnel Rule XVIII, has limited itself in its ability to consider dismissal as a form of discipline for first-time violations in certain, specific instances, 
i.e
, where the violative conduct is described in a subparagraph not preceded by an asterisk.

The City contends an interpretation of section 1 which places such a limit on the City's ability to proceed directly to dismissal, "renders surplusage the discretion allowed [in Section 2] in deciding whether to impose progressive discipline."  We disagree.

On the contrary, we think an interpretation of section 2 which would allow the City to dismiss an employee for any conduct prohibited in section 1, regardless of whether the conduct is listed in a subparagraph preceded by an asterisk, would render the language regarding the asterisk in section 1 meaningless.  Nor would there be any reason for the eight capitalized qualifying conditions for first offense discharge in the asterisked subparagraphs.

In 
Silverman v. Economy Fire and Casualty Co.
, 272 Ill. App. 3d 490, 650 N.E.2d 603 (1995), this court found that boldface type used in an insurance contract was "purposely inserted and not employed idly."  When the boldface type wasn't employed, the same meaning did not attach. 

Applying the same logic to the facts of this case, we find no reason for the City to place asterisks before some subparagraphs but not others, unless it intended the asterisks to mean something.  See also, 
People v. Jordan
, 103 Ill. 2d 192, 469 N.E.2d 569 (1984)(construction of statute is too narrow if it would, in effect, omit the words "the class of" from the subject clause); 
People v. Bartlett
, 294 Ill. App. 3d 435, 690 N.E.2d 154 (1998)(interpretation which renders the word "statement" meaningless rejected).

Rather than interpreting the Personnel Rules in a way which ignores the asterisks and the language concerning the use of the asterisks at the beginning of section 1, it is more reasonable to interpret the rule in a way which gives recognition to all language used.  
People v. Bartlett
, 294 Ill. App. 3d at 439 (
If two interpretations are possible, the one that gives all words in the statute some meaning will be the one that is more reasonable).

The Personnel Rules, having the force and effect of law, as the parties agree, can be looked on as a type of employment contract.  The Rules, therefore, like an employee handbook, create binding contractual obligations.  See 
Duldulao v. St. Mary of Nazareth Hospital Center
, 115 Ill. 2d 482, 505 N.E.2d 314 (1987)(employee handbooks, under certain circumstances, can be contractually binding).  Also, see 
Williams v. Chicago Housing Authority
, 217 Ill. App. 3d 1055, 578 N.E.2d 71 (1991)(
Duldulao
 applied to contracts with public employer.)

Here an employee reasonably would have interpreted the absence of an asterisk before certain subparagraphs of Rule XVIII, sec. 1, to mean he or she could not be dismissed for first-time violations of these provisions.  That became a valid contractual promise.  See 
Belsanti v. CFS Holdings, Inc.
, 260 Ill. App. 3d 419, 632 N.E.2d 10 (1992).  Public agencies, especially, should keep their promises.

A reasonable interpretation of section 1 is that the City gave its employees notice certain conduct was unacceptable and would result in disciplinary action being taken against them, unless circumstances demonstrated the conduct to be excusable.  City employees were also put on notice that certain conduct, by its very nature, is a more serious offense and, for this reason, might result in dismissal, even for a first-time offense.  These behaviors, the City tells its employees, are denoted by an asterisk.

The rules carefully circumscribe the situations where first-

time conduct can result in discharge.  If the City could discharge for any first-time conduct anyway, there would be no reason to place limits on Rule XVIII, section 1 subparagraphs where the asterisk appears.

Section 2, entitled "Progressive Discipline," read in conjunction with section 1, is a promise that progressive discipline will be employed whenever possible.  While the City recommends progressive discipline, that procedure is not mandatory.  Department heads are afforded considerable discretion and authority to bypass steps in the progression when deemed necessary.

Sections 1 and 2, when read together, however, inform the employee that the department heads' discretion to bypass progressive discipline and proceed directly to discharge will be limited by restrictions on that power, as set forth in section 1.  That is, the discretionary power of department heads does not reach discharge for first-time violations of section 1 subparagraphs not preceded by an asterisk.

If the City intended some other result it would have been easy to say so in section 2.  (For example, "Nothing in these rules is intended to prevent the discharge of employees for first-time violations of any subparagraph in section 1.")  We believe the point of the second paragraph in section 2 is to empower department heads to impose discipline for misconduct not specifically listed in section 1.  Here, however, we are concerned with violations of particular subparagraphs.

The basic rule of statutory construction tells us where "...a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions, despite the lack of any negative words of limitation."  
Solich v. George and Anna Portes Cancer Prevention Center
, 158 Ill. 2d 76, 82, 630 N.E.2d 820 (1994).  Section 1 lists the specific "things" that support a first-time discharge -- the subparagraphs preceded by an asterisk.  The inference that follows is that the subparagraphs containing no asterisks were intended to exclude discharge for first-time violations.

Our interpretation of Personnel Rule XVIII is reasonable and gives significance to the language contained in both sections 1 and 2, without rendering any words or symbols meaningless.

A finding that the City intended, in every case, to allow department heads the discretion to proceed directly to dismissal for a violation of any one of the personnel rules, first-time conduct or not, is contrary to the unambiguous language of Rule XVIII.  Such an interpretation would make section 1 meaningless and would grant unfettered discretion to department heads.  The rules would mean whatever the City wants them to mean.  There would be no predictability or stability to the rules.  If that is the City's purpose, it should say so -- clearly and simply.  Employers know how to reserve discretion to themselves when it comes to reasons for discharge.  See 
Mitchell v. Jewel Food Stores
, 142 Ill. 2d 152, 170-71, 568 N.E.2d 827 (1990).

3. 
Just Cause Standard

Since we find the Personnel Rules do not provide for discharge of an employee for a first-time violation of subparagraphs 29 and 39, we need not consider McTigue's third issue -- whether the "just cause" standard was applied when the Board decided that discharge was the appropriate disciplinary action.

       
CONCLUSION

We affirm the Board's finding that McTigue violated subparagraphs 29 and 39.  The decision of the Personnel Board to uphold McTigue's discharge based on his first-time violations of these subparagraphs, however, is reversed.  Another level of discipline, other than discharge, may be imposed.  We remand to the Personnel Board for that purpose.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

SOUTH, P.J. and McNAMARA, J., concur.