FIFTH DIVISION 
 May 2, 1997 
 




No. 1-96-1356

METROPOLITAN LIFE INSURANCE ) 
COMPANY, a New York corporation, )
 )
 Plaintiff and Counterdefendant- ) Appeal from the
 Appellant, ) Circuit Court of
 v. ) Cook County.
 )
AMERICAN NATIONAL BANK AND TRUST ) 
COMPANY, As Trustee Under Trust ) 
Agreement Dated November 29, 1978 and )
known as Trust No. 45275; WOODFIELD )
HOTEL LIMITED PARTNERSHIP, A Revoked ) 
Illinois Limited Partnership; WOODFIELD )
HOTEL CORPORATION, A Dissolved Delaware ) 
Corporation; BOSTON SAFE DEPOSIT ) 
COMPANY OF BOSTON, A Massachusetts ) 
Corporation, As Trustee of the U.S. )
West Master Trust; U.S. WEST MASTER )
TRUST; INTERSTATE HOTELS CORPORATION, ) Honorable
A Delaware Corporation; JONES LANG ) Margaret S. McBride,
WOOTTON REALTY ADVISORS, A New York ) Judge Presiding. 
Corporation, )
 Defendants, ) 
 and )
 )
BANK ONE CHICAGO, N.A., Successor by )
Merger with Bank One, LaGrange f/k/a )
First Illinois Bank & Trust, )
 )
 Defendant and Counterplaintiff )
 Intervenor-Appellee. )
 

 JUSTICE SOUTH delivered the opinion of the court:

 Appellant, Metropolitan Life Insurance Company (Met Life),
appeals from an order of the circuit court of Cook County denying
its cross-motion for summary judgment and granting appellee's,
Bank One Chicago, N.A. (Bank One), motion for summary judgment. 
 On September 19, 1980, Met Life loaned $13,500,000 to the
American National Bank and Trust Company of Chicago (Trustee). 
At that time, the Trustee held legal title to the real property, 
buildings and improvements now commonly known as the Woodfield
Hilton Hotel, a 452-room hotel located at 3400 West Euclid
Avenue, Arlington Heights, Illinois (the Hotel). George J. Ablah
(Ablah) and the Magnum Hotel Corporation (Magnum) owned the
beneficial interest in the land trust.
 To secure the promissory note evidencing the loan, the
Trustee executed a mortgage, assignment of rents, security
agreement and Uniform Commercial Code (UCC-1) financing
statement. To further secure the promissory note, Ablah and
Magnum executed a security agreement. The security agreement
granted Met Life a security interest in the hotel's existing and
after-acquired furniture and equipment (F&E). Met Life perfected
its security interest in the hotel F&E by filing UCC-1 financing
statements with the Illinois Secretary of State's office. 
 On or about May 3, 1985, Ablah and Magnum entered into an 
agreement to sell the hotel real property and personalty to USW
Arlington Hotel Corporation (USW). On or about June 25, 1985,
the sale agreement was amended to provide for the transfer of the
hotel F&E to the Magnum Hotel Trust (Grantor Trust). 
 Pursuant to the parties' security agreement, Ablah and
Magnum had to obtain Met Life's authorization before the hotel
could be sold. On June 28, 1985, after review of the sale
agreement, Met Life consented to the sale by letter. On or about
July 1, 1985, USW closed the purchase of the hotel, thereby
acquiring ownership of the hotel real property and the hotel F&E. 
Subsequent to the sale, nearly all of the transferred F&E was
replaced. 
 In February of 1987, USW established a $500,000 revolving
line of credit with Bank One's predecessor, First Illinois Bank &
Trust (First Bank), to cover taxes and insurance payments. To
secure its obligations to First Bank, USW executed a series of
security agreements granting First Bank a security interest in
the hotel F&E. 
 On or about March 22, 1988, USW revoked and terminated the
Grantor Trust and distributed the hotel F&E to the Woodfield
Hotel Limited Partnership (the Partnership), its sole
shareholder. USW then filed articles of dissolution, dissolving
itself as a corporation. 
 Between 1990 and 1992, First Bank became Bank One. Bank One
subsequently made new loans to the Partnership and required the
Partnership to execute new security agreements. The last
security agreement was executed on February 1, 1990. The 1990
security agreement granted Bank One a security interest in
existing and after-acquired F&E. Bank One perfected its security
interest by filing a UCC-1 financing statement on March 7, 1990. 
 In August of 1992, Bank One extended to the Partnership a
new $500,000 revolving line of credit. To evidence the loan, the
parties executed a business-purpose revolving promissory note
(Promissory Note), a business loan agreement, a borrowing base
addendum and a UCC-1 financing statement. Although the 1992
promissory note made reference to a 1992 security agreement, Bank
One and the Partnership failed to execute a 1992 security
agreement. 
 On December 1, 1992, the Partnership defaulted under Met
Life's mortgage. On January 20, 1993, Met Life filed a complaint
to foreclose its mortgage against the hotel's real property and
personalty. On February 2, 1993, the Partnership stipulated to
the entry of a decree of foreclosure and sale of the hotel real
property and personalty. 
 On or about March 1, 1993, the Partnership defaulted under
Bank One's 1992 promissory note. On March 25, 1993, Bank One
moved to intervene in Met Life's foreclosure action. Upon
intervention, Bank One filed a counterclaim asserting a prior
security interest in the hotel F&E, and it requested the court to
award Bank One the proceeds from the sale of the hotel F&E. 
 By agreement between Met Life and Bank One, the circuit
court entered an order on April 1, 1993, that $500,000 of the
proceeds from the sale of the hotel F&E shall be reserved for
later determination of the validity and relative priority of the
parties' liens. Thereafter, Met Life filed an amended complaint
asking the circuit court to declare that its security interest in
the hotel F&E was superior to Bank One's and to order the turn-
over of the proceeds to Met Life. On April 6, 1993, Met Life
purchased the hotel at public auction. 
 On October 18, 1995, Bank One filed a motion for summary
judgment pursuant to section 2-1005(c) (735 ILCS 5/2-1005(c)
(West 1994)). On December 13, 1995, Met Life filed a response to
Bank One's motion and cross-motioned for summary judgment. On
January 4, 1996, Bank One filed its reply to Met Life's response
and cross-motion. On March 6, 1996, the circuit court granted
Bank One's motion for summary judgment, denied Met Life's motion
for summary judgment, and ordered Met Life to pay Bank One the
$500,000 in proceeds reserved from the foreclosure sale of the
hotel F&E. 
 In denying Met Life's motion for summary judgment, the
circuit court found that Met Life acquired a valid perfected
security interest in the hotel F&E of the original owners, Ablah
and Magnum. Nevertheless, Met Life lost its security interest
when it consented to the transfer of the F&E to USW, through the
Grantor Trust, in the consent letter. The circuit court found
that it was not disputed that Met Life failed to obtain a new
security agreement and file a new financing statement after the
transfer of the hotel F&E. The circuit court also noted that
since nearly all of the transferred F&E was replaced after 1985,
it was impossible for Met Life to currently have an interest in
the after-acquired F&E.
 In granting Bank One's motion for summary judgment, the
circuit court found that although Bank One and the Partnership
failed to execute a new security agreement in 1992, Bank One
maintained a perfected security interest in the hotel F&E
pursuant to its 1990 security agreement's dragnet clause. The
circuit court found that the 1990 security agreement's dragnet
clause remained in force because Bank One did not receive written
notice of termination from the Partnership. Met Life appeals. 
We affirm in part, and reverse in part.
 OPINION
 As a preliminary matter, Bank One has requested that this
court take judicial notice that Bank One has obtained a money
judgment against the Partnership and that Bank One has a judgment
lien upon the Partnership's assets. On August 27, 1996, Bank One
filed a complaint against the Partnership alleging that the
Partnership owed Bank One $450,000 and interest totaling
$151,527.54 and further interest accruing at a per diem rate of
$153.13. On November 13, 1996, a consent order was entered in
the circuit court of Cook County in favor of Bank One and against
the Partnership in the amount of $610,102.82. 
 This court may take judicial notice of public documents that
are included in the records of other courts. NBD Highland Park
Bank, N.A. v. Wien, 251 Ill. App. 3d 512, 622 N.E.2d 123 (1993). 
Accordingly, Bank One's request that we take judicial notice that
Bank One has obtained a money judgment against the Partnership
and that Bank One has a judgment lien upon the Partnership's
assets is granted.
 Summary judgment is proper where "the pleadings,
depositions, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." 735 ILCS 5/2-1005(c) (West
1994). Summary judgment is to be granted only where the
evidence, when construed most strongly against the moving
party, establishes clearly and without doubt the movant's
right to relief. Signal Capital Corp. v. Lake Shore National
Bank, 273 Ill. App. 3d 761, 652 N.E.2d 1364 (1995). Summary
judgment is particularly appropriate where all parties file for
summary judgment. Signal, 273 Ill. App. 3d 761, 652 N.E.2d 1364. 
This court reviews the propriety of an order granting summary
judgment de novo, independent of the circuit court's reasoning on
the issues presented. Pagano v. Occidental Chemical Corp., 257
Ill. App. 3d 905, 629 N.E.2d 569 (1994). "If, from a review of
the pleadings and evidentiary material before the [circuit]
court, [this court] determines that a material issue of fact
exists or that the summary judgment was based upon an erroneous
interpretation of the law, a reversal is warranted." Pagano, 257
Ill. App. 3d at 909, 629 N.E.2d at 572. 
 Met Life contends that it retained its security interest in
the existing and after-acquired hotel F&E after consenting to the
1985 sale of the hotel and that an issue of fact exists as to
whether Met Life intended its consent to the 1985 sale to 
relinquish its interest in the hotel F&E. In support of this
contention, Met Life argues that nowhere in the letter did it
clearly and unambiguously authorize disposition of the collateral
"free and clear" of its interest in the hotel F&E and that, in
1985 and 1990, it filed UCC continuations of the 1980 UCC
financing statements executed by the Trustee, Ablah and Magnum, 
indicating Met Life's intention to maintain its security interest
in the hotel F&E. 
 Section 9-306(2) of the UCC provides: "Except where this
Article otherwise provides, a security interest continues in
collateral notwithstanding sale, exchange or other disposition
thereof unless the disposition was authorized by the secured
party in the security agreement or otherwise ***." (Emphasis
added.) 810 ILCS 5/9-306(2) (West 1994). 
 Met Life's June 28, 1985, consent letter stated in relevant
part:
 "Reference is hereby made to that certain
 Purchase and Sale Agreement dated as of May 3,
 1985 by and among Ablah, Magnum (seller) and
 USW (purchaser) and the certain Amendment
 executed by the same parties as of June 25,
 1985, copies of which documents we have
 received. We acknowledge that under the
 Agreement, seller and Ablah will assign to
 Purchaser the beneficial interests under a
 land trust and a grantor trust, the assets of
 which trusts collectively constitute the
 Arlington Park Hilton (the Hotel) located in
 Arlington Park, Illinois. After the closing
 under the Agreement, purchaser, as the
 beneficiary of the grantor trust, could cause
 the assets of the grantor trust to be
 transferred to purchaser and cause the grantor
 trust to terminate. The Hotel is subject to a
 mortgage in favor of the undersigned, recorded
 October 8, 1980 with the recorder of Deeds of
 Cook County, Illinois, as document No.
 25616211, which Mortgage shall remain in place
 notwithstanding the consummation of the
 transactions described above.
 Please be advised that Metropolitan Life
 Insurance Company hereby consents to the
 transactions described in the Agreement and,
 if Purchaser subsequently elects to terminate
 the grantor trust, Metropolitan Life Insurance
 Company agrees to consent to the transfer of
 the assets of the grantor trust to Purchaser."
 

 The sale agreement provided that the assets being sold would
be "free and clear" of all liens and other encumbrances excluding
permitted title exceptions. Met Life reviewed the sale agreement
and forwarded its letter of consent thereto. The permitted title
exceptions included Met Life's mortgage lien on the real property
and Met Life's security interest in certain real fixtures. 
However, the title exceptions did not include Met Life's interest
in the hotel F&E. Therefore, Met Life lost its security interest
pursuant to section 9-306(2) (810 ILCS 5/9-306(2) (West 1994))
and was required to recreate its security interest in the hotel
F&E under section 9-203 (810 ILCS 5/9-203 (West 1994)). 
 The requirements for the creation of a security interest by
a debtor in favor of his creditor are that: (1) the debtor must
have or acquire rights in the collateral; (2) the creditor must
give value to the debtor; (3) the creditor and the debtor must
agree that a security interest shall attach to the collateral;
and (4) either the collateral must be in the possession of the
creditor or there must be a written security agreement signed by
the debtor that contains a description of the collateral. 810
ILCS 5/9-203 (West 1994); Voutiritsas v. Intercounty Title Co.,
279 Ill. App. 3d 170, 664 N.E.2d 170 (1996). Met Life held a
valid perfected security interest in the existing and after-
acquired F&E when it made its loan to the hotel trustee in 1980. 
However, after consenting to the transfer of the F&E by the hotel
to the USW Grantor Trust, in the letter dated June 28, 1985, Met
Life lost its security interest in the hotel F&E and, thereafter,
failed to satisfy the requirements under section 9-203 (810 ILCS
5/9-203 (West 1994)) to recreate its security interest. 
 Furthermore, "[w]here the debtor so changes his name or in
the case of an organization its name, identity or corporate
structure that a filed financing statement becomes seriously
misleading, the filing is not effective to perfect a security
interest in collateral acquired by the debtor more than 4 months
after the change, unless a new appropriate financing statement is
filed before the expiration of that time." 810 ILCS 5/9-402(7)
(West 1994). 
 Here, notwithstanding Met Life's knowledge of and consent to
the 1985 sale and transfer of the hotel F&E, Met Life did not
require either USW or the Grantor Trust to execute a new security
agreement or UCC-1 financing statement relating to the hotel F&E. 
Accordingly, the circuit court's order denying Met Life's motion
for summary judgment was proper. 
 Met Life contends that the circuit court erred in finding
that Bank One had a perfected security interest in the hotel's 
F&E. Met Life reasons that despite the fact that the business
loan agreement between Bank One and the Partnership is not
labeled "security agreement," under the UCC, the business loan
agreement is a valid security agreement. Met Life argues that
the 1992 business loan agreement clearly describes Bank One's
collateral as accounts receivable only, not F&E. Met Life posits
that this agreement superseded and terminated the 1990 security
agreement's dragnet clause. Therefore, Met Life concludes, the
Partnership did not provide Bank One a perfected security
interest in the hotel F&E.
 Bank One contends that it has a perfected security interest
in the hotel F&E. Bank One reasons that it inadvertently failed
to execute a new security agreement in 1992. However, Bank One
argues that the dragnet clause in its 1990 security agreement
granted Bank One a continuing perfected security interest in the
existing and after-acquired hotel F&E. In support of its
position, Bank One cites In re Kazmierczak, 24 F.3d 1020 (7th
Cir. 1994). In Kazmierczak, the court held that the fact "that
the parties had intended to execute a fresh security agreement
every year has no weight at all. The 'future debts' clause was a
hedge against their failing to do so. They could of course have
canceled it by mutual consent." Kazmierczak, 24 F.3d 1021. 
 Dragnet clauses are specifically authorized by section 9-
204(3) (810 ILCS 5/9-204(3) (West 1994)) of the UCC, which
provides: 
 "Obligations covered by a security agreement
 may include future advances or other value
 whether or not the advances or value are given
 pursuant to commitment ***." 810 ILCS 5/9-
 204(3) (West 1994). 
 
 In Stannish v. Community Bank of Homewood-Flossmoor, 24
Bankr. 761 (N.D. Ill. 1982), the bankruptcy court had occasion to
examine the enforceability of dragnet clauses under Illinois law. 
In that opinion, the bankruptcy court indicated that although
dragnet clauses are not favored under Illinois law, they will be
upheld where no ambiguity exists and will be interpreted
according to the language used. Some courts in other states
impose a relatedness test to determine whether future advances
are covered. Those courts have stated that future advances, to
be covered, must be of the same class as the primary obligation
and so related to it that the debtor's consent to its inclusion
may be inferred. In re Hunter, 68 Bankr. 366 (C.D. Ill. 1986). 
As noted in Hunter, however, Illinois law does not follow this
view.
 In determining that Bank One possessed a perfected security
interest in the hotel F&E, the circuit court found that Bank One
did not receive written notice of termination and, therefore, the
1990 security agreement's dragnet clause remained in effect. We
disagree. 
 In general, a security agreement is effective according to
its terms between the parties (810 ILCS 5/9-201 (West 1994)).
The 1990 security agreement's dragnet clause stated: 
 "As security for the performance and
 payment of all of Borrower's liabilities to
 Bank, including performance of the terms and
 provisions of any applicable Loan Agreement
 between Borrower and Bank, Borrower hereby
 pledges, assigns, transfers, delivers and
 grants Bank a continuing security interest in
 the hotel F&E to secure 'any and all
 liabilities, obligations, indebtedness and
 contractual duties of every kind and nature
 of the Borrower now and hereinafter
 existing.'" 

The 1990 security agreement's termination clause stated:
 "This agreement shall remain and
 continue in full force and effect
 (notwithstanding the non-existence at any
 time of any Liabilities secured or intended
 to be secured hereby) unless and until such
 time as the Bank shall have received from
 Borrower at Bank's main office written notice
 of the termination of this agreement." 

 Notwithstanding the fact that the 1990 security agreement's
dragnet clause granted Bank One a continuing security interest in
the hotel F&E to secure future obligations, an ambiguity exists
between the 1990 dragnet clause and the documents executed when
the Partnership incurred the $500,000 obligation in 1992. In
addition, the conditions of the 1990 security agreement's
termination clause were satisfied, thereby rendering the 1990
security agreement's dragnet clause ineffective. 
 In the 1992 promissory note, Bank One made reference to a
security agreement "covering accounts receivable." In the 1992
business loan agreement, although there is a designated space to
check the hotel F&E as collateral, Bank One elected not to check
this space. Bank One checked only accounts, general intangibles,
and other forms of obligations and receivables. In the 1992
borrowing base addendum, although there is a designated space to
check equipment, Bank One elected not to check this space. Bank
One checked only "accounts receivable up to a maximum of
$500,000," the entire amount of the 1992 loan. In the 1992 UCC-1
financing statement, Bank One made reference to a security
agreement "covering accounts receivable." The 1992 documents
consistently made reference only to accounts receivable as
security for the 1992 loan. Hence, an ambiguity exists as to
whether the Partnership intended to secure the 1992 loan with
accounts receivable only or with both accounts receivable and the
hotel F&E. 
 Moreover, the record shows that the Partnership's prior
promissory note was paid in full, and that Bank One and the
Partnership terminated the 1990 security agreement by mutual
consent when they executed the 1992 business loan agreement. The
1992 business loan agreement precisely and unambiguously
provided:
 "[T]his agreement contains the entire
 agreement of the parties and supersedes all
 prior agreements and understandings, oral or
 written, with respect to the subject matter
 hereof." (Emphasis added.) 

There is no dispute that the subject matter in the 1992 business
loan agreement was the terms and conditions for the $500,000 loan
provided the Partnership by Bank One in 1992. 
 It is well established that contracts are construed against
the drafter. Duldulao v. St. Mary of Nazareth Hospital Center,
115 Ill. 2d 482, 505 N.E.2d 314 (1987). The 1992 documents were
drafted by Bank One. Bank One cannot now posit that its drafting
and execution of the precise and unambiguous language that the
1992 business loan agreement "supersede all prior agreements and
understandings" is to have no legal force and effect. 
 Had Bank One wanted to perfect a security interest in the
hotel F&E, it would have been a simple matter to add to the 1992
documents a reference to the hotel F&E and to incorporate the
1990 security agreement. To the contrary, Bank One drafted and
executed explicit language superseding all prior agreements,
thereby rendering the 1990 security agreement ineffective.
"Moreover, banks can easily avoid such potential losses of
collateral by careful drafting, and we see no good reason to
apply unjustifiably loose constructions to documents of this
kind." See In re Schmaling, 783 F.2d 680 (7th Cir. 1986). 
 As there is an ambiguity between the 1990 security
agreement's dragnet clause and the 1992 documents that refer only
to accounts receivable, and considering the fact that Bank One
and the Partnership terminated the 1990 security agreement by
mutual consent when they executed the 1992 business loan
agreement, the 1990 dragnet clause was not effective under
section 9-204 (810 ILCS 5/9-204 (West 1994)) to create a security
interest in the hotel F&E as security for the 1992 loan.
 In light of the foregoing, summary judgment that the 1990
security agreement's dragnet clause provided Bank One a perfected
security interest in the hotel F&E, as security for the 1992
loan, cannot be upheld. 
 Accordingly, the order of the circuit court denying Met
Life's motion for summary judgment is affirmed, and the order of
the circuit court granting Bank One's motion for summary judgment
is reversed. 
 Affirmed in part and reversed in part.
 HARTMAN, P.J., and HOURIHANE, J., concur.