# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Selch v. Columbia Management*, 2012 IL App (1st) 111434

---

| | |
|---|---|
| Appellate Court Caption | JASON SELCH, Plaintiff-Appellant, v. COLUMBIA MANAGEMENT, COLUMBIA WANGER ASSET MANAGEMENT, L.P., BANK OF AMERICA, INC., and WAM RIGHTS PARTNERSHIP, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket Nos. 1-11-1434, 1-11-2060 cons. |
| Filed | August 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff was properly terminated "for cause" from his position as an investment analyst for "mooning" his superiors and there was no breach of contract involved, regardless of plaintiff's contention that the formal warning he received for his conduct was a contract precluding termination if plaintiff did not violate any other company standards, since the formal warning did not constitute a contract. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CH-16773; the Hon. Kathleen M. Pantle, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael A. Stiegel, Brian P. Paul, and Jolanda B. Krawczyk, all of Michael Best & Friedrich, of Chicago, for appellant.

James A. Burns, Jr., and Hannah L. Kaplan, both of Reed Smith LLP, of Chicago, for appellee Bank of America, Inc.

Stephen Novack, P. Andrew Fleming, Andrew D. Campbell, and Christopher S. Moore, all of Novack & Macey LLP, of Chicago, for other appellees.

Panel

JUSTICE MURPHY delivered the judgment of the court, with opinion.

Justices Neville and Salone concurred in the judgment and opinion.

## OPINION

¶ 1      Plaintiff, Jason Selch, appeals from an order of the circuit court of Cook County granting summary judgment in favor of defendants, Columbia Management, Columbia Wanger Asset Management, L.P. (C-WAM), Bank of America, Inc., and WAM Rights Partnership. On appeal, plaintiff asserts that the court erred in granting summary judgment where a genuine issue of material fact exists as to: (1) whether defendant was properly terminated for cause; and (2) whether C-WAM's formal warning agreement constituted a contract. Additionally, plaintiff contends that the court erred in striking his late jury demand. For the following reasons, we affirm the judgment of the trial court.

¶ 2      I. BACKGROUND

¶ 3      Plaintiff, Jason Selch, filed a nine-count second amended complaint with the circuit court of Cook County on September 11, 2008. Plaintiff's complaint asserted the following claims: declaratory judgment against Bank of America (BOA) (count I); breach of contract against BOA (count II); declaratory judgment against WAM Rights Partnership (the Partnership) (count III); tortious interference with contract against C-WAM (count IV); tortious interference with contract against BOA (count V); tortious interference with contract against BOA Columbia Management (Columbia) (count VI); breach of contract against C-WAM (count VII); breach of contract against Columbia and C-WAM (count VIII); and tortious interference with contractual relationships against Columbia and BOA (count IX).

¶ 4      The first six counts are based on plaintiff's contention that defendants were not justified in terminating him for cause in conjunction with an October 31, 2001, letter agreement (Letter Agreement) between the Partnership and plaintiff. The next three counts are based on plaintiff's assertion that he was terminated in violation of a formal warning letter (the

Formal Warning), which plaintiff contends was a contractual agreement between C-WAM and himself.

¶ 5 The parties filed cross-motions for summary judgment. On February 26, 2010, the circuit court granted defendants' motion for summary judgment on counts VII and VIII, finding that the Formal Warning, as a matter of law, did not constitute a contract. Then, on April 19, 2011, the circuit court granted defendants' remaining claims for summary judgment, finding that, as a matter of law, plaintiff's conduct fell under the definition of "cause" in the Letter Agreement. Plaintiff appealed.

¶ 6 A. History of Plaintiff's Employment

¶ 7 On June 27, 1994, plaintiff was hired by Wanger Asset Management, L.P. (WAM), as an investment analyst. In 1999, plaintiff was awarded fractional partnership appreciation rights in WAM, as a reward for his strong performance. After a series of transactions, WAM was eventually bought out by C-WAM, a subsidiary of BOA, and plaintiff obtained the right to a percentage of the proceeds from the sale of WAM to Liberty Financial Companies, Inc. (Liberty) (one of the transactions prior to the buy out by C-WAM). Plaintiff's percentage of the proceeds was to be paid through an up-front payment, a three-year contingent payment, and a five-year contingent payment. At the time of his termination from C-WAM, the contingent payments were worth close to $2 million.

¶ 8 The initial acquisition of WAM, by Liberty, occurred on June 9, 2000. The parties involved executed an agreement and plan of merger (Merger Agreement) to join the two companies. When Liberty bought WAM, it paid an initial lump-sum payment and two contingent, or future, payments (Contingent Payments), based on the profitability of the new company, Liberty Wanger Asset Management, L.P. (L-WAM). As a result of the merger, plaintiff agreed to cancel his WAM fractional partnership appreciation rights for a lump-sum payment and two contingent payments.

¶ 9 In September 2009, the Partnership created the WAM rights partnership nonqualified profit sharing plan (the Plan) to provide for the distribution of the Contingent Payments to plaintiff and others in his position. As a part of the Plan, the participants in the Plan could lose their rights to the Contingent Payments if they were terminated for "cause" or for "good reason," as defined in the Plan.

¶ 10 After the acquisition of WAM by L-WAM, Liberty again put itself up for sale. As a result of this decision, Liberty provided its employees, including plaintiff, with an employment agreement (Agreement) in order to ensure that they were secure in their positions. The Agreement provided employees with at least two years of employment from the date of the closing of any sale a severance package totaling $695,000 plus benefits. Again, as with the Plan, the Agreement identified that employees could be terminated by the company for "cause" or "good reason" and noted that if employees were thus terminated, they would sacrifice their severance packages. The Agreement defined "cause" for termination as a:

> "conviction of a felony, engaging in misconduct that injures the Company, performing your duties with gross negligence or any material breach of your fiduciary duties as an employee of the Company."

¶ 11    Likewise, the Agreement defined "good reason" for termination as:

"(i) a reduction in your base compensation, (ii) a material change in your level of work responsibilities which has not been remedied within 30 days after you have given written notice of such claimed event or (iii) a requirement that you be based at a location more than 50 miles outside the Chicago metropolitan area."

¶ 12    Six months after plaintiff executed the Agreement, Liberty and Fleet National Bank (Fleet) executed a transaction, whereby Fleet acquired the outstanding stock and equity of Liberty, the Agreement went into effect, and L-WAM became C-WAM.

¶ 13    The Letter Agreement, which was created on October 31, 2001, through the transaction of Fleet and Liberty, amended the Merger Agreement. There were nine parties to the Letter Agreement: L-WAM; BOA (then FNB); the Partnership; WAM Acquisition GP, Inc.; and Ralph L. and Leah Z. Wanger, Charles P. McQuaid, Robert A. Mohn, and John H. Park. The Letter Agreement again provided that an employee or partner of C-WAM would lose his or her right to receive the Contingent Payments if he or she were terminated for "cause," as defined in the companies' respective employment agreements. Liberty and Fleet officially became C-WAM on November 1, 2001.

¶ 14    Finally, on April 1, 2004, Fleet merged with BOA and C-WAM came to be owned by Columbia, a subsidiary of BOA. BOA became the umbrella company for all those involved. BOA assumed the rights and obligations which had been created by Fleet under the October 31, 2001, Letter Agreement.


¶ 15                        B. Plaintiff's Termination
¶ 16                        1. *The "Mooning"*
¶ 17    On April 27, 2005, plaintiff was informed that a friend and colleague of his at C-WAM, Chris O'Dea, had been terminated because he refused to accept a lower wage in his new position within Columbia and BOA. Plaintiff additionally found out that Roger Sayler, Columbia's chief operating officer (COO) in New York, and Charles McQuaid, C-WAM's chief investment officer (CIO) in Chicago–and plaintiff's direct boss in the Columbia/BOA hierarchy–had terminated O'Dea earlier that day.

¶ 18    In response to this action, plaintiff testified that he was very upset and wanted to tell Sayler and McQuaid how he and the rest of the team felt about O'Dea's termination. In order to do so, plaintiff opened the door to the conference room in which Sayler and McQuaid were seated, and walked in. Once in the conference room, plaintiff testified–and Sayler and McQuaid concurred–that he asked the two men if he had a noncompete agreement with the company. Sayler and McQuaid responded that plaintiff did not, and plaintiff proceeded to unbuckle his pants, pull them down, and "moon" Sayler and McQuaid. Afterwards, Sayler and McQuaid testified that plaintiff pulled up his pants and stated that he hoped Sayler would never come back to the Chicago office. Plaintiff then walked out of the conference room.

¶ 19    Plaintiff testified that he knew that his behavior–"mooning" Sayler and McQuaid–could potentially cause him to lose his job, and that he asked about the noncompete agreement for that reason; so that he could potentially find new employment if he were terminated. Sayler

responded by saying, "Wow, I don't believe that just happened. We'll have to figure out how to deal with that, we've got to, we've got more things we have to talk about." He then noted that if the BOA chief executive officer, Keith Banks, were present, plaintiff would have been terminated on the spot. The meeting then ended with no decision about what to do regarding plaintiff's "mooning."

¶ 20                                   *2. The Formal Warning Letter*

¶ 21     In response to plaintiff's actions, McQuaid, Sayler, Chris Cooley (vice-president and executive human resources representative of BOA, who was assigned to C-WAM), Chris Hamilton (C-WAM's human resources manager), and Jay Price (BOA's associate general counsel) met to discuss an appropriate action for dealing with the "mooning." Instead of terminating plaintiff, the executive management group (those mentioned above), got approval from Sayler to discipline plaintiff by issuing him a formal written warning (Formal Warning).

¶ 22     McQuaid testified that he would have terminated 99 out of 100 people for having displayed the same behavior as plaintiff, but decided against terminating plaintiff because he was a valuable employee of C-WAM who had exhibited exemplary performance throughout his years with the company. Nevertheless, McQuaid knew that he had to answer to both Sayler and Banks, and that the ultimate decision as to what to do about the "mooning," was not necessarily his to make. As a result, McQuaid informed plaintiff the next day that he, McQuaid, would have to "beg" for plaintiff's job.

¶ 23     While these decisions were being made, Banks, Columbia's chief executive officer, was on vacation and was not contacted about the "mooning" or about the executive management group's decision to issue a formal warning letter to plaintiff as a disciplinary measure until he returned to New York. During the meantime, Hamilton drafted the Formal Warning and had it approved by McQuaid, Cooley, Price, and Sayler. After Sayler approved the Formal Warning on April 29, 2005, McQuaid and Hamilton delivered it to plaintiff.

¶ 24     The Formal Warning lowered the standard of "cause" for termination found in plaintiff's December 19, 2000, Agreement and the October 31, 2001, Letter Agreement (which had adopted the original definitions for termination for "cause" or "good reason"). The standard now stated that plaintiff could be terminated if, at any point in the future, he violated any of the company's standards in any aspect of his job. At the end of the Formal Warning, there was a space where McQuaid signed and dated the letter, and below it there was a sentence, which stated: "I have read and understand the contents of this warning," below which plaintiff signed the letter. Plaintiff did not bargain for or negotiate the terms of the warning; he simply signed the Formal Warning.

¶ 25     The Formal Warning itself was a disciplinary action. It did not contain a promise or guarantee to plaintiff that he would be able to keep his job with the company. Within the letter, McQuaid and Hamilton stated that they "hope[d] that further disciplinary actions will not be necessary and that [plaintiff] continue on as a productive staff member of the investment team here at Columbia Wanger."

¶ 26     After the Formal Warning was issued to plaintiff, he did not engage in any other

insubordinate or inappropriate conduct. Additionally, McQuaid sent plaintiff to New York to conduct a client meeting within a week after plaintiff had been given the Formal Warning. McQuaid testified that this meeting had been planned before the "mooning" and therefore it was necessary that plaintiff attend it, as he had not yet been terminated.

¶ 27    *3. Banks Learns of "Mooning" and Has Plaintiff Terminated*

¶ 28    On May 2, 2005, Banks returned from vacation to learn of the "mooning" that had occurred on April 27. Banks was Sayler's direct superior, and since McQuaid reported directly to Sayler, Banks was two levels up from McQuaid. Banks asserted in his testimony that BOA was the umbrella company, and therefore, all the involved parties were employees of BOA. Therefore, since plaintiff was under McQuaid's authority in the company's hierarchy, he was also under the management of Banks. When Banks learned that McQuaid and the rest of the executive management group had only issued plaintiff a warning, he expressed his surprise that plaintiff had not been terminated on the spot, and stated that, "the course of action that they[, *i.e.*, the executive management group] had intended to take was not an acceptable course of action."

¶ 29    Banks then called McQuaid to set up a meeting and try to convince him of the need to terminate plaintiff. McQuaid asserted that plaintiff was a valuable employee and that terminating him would hurt both employee morale at C-WAM and business at the company as well, since he was C-WAM's "bridge between its domestic and international teams." Additionally, McQuaid testified that he told Banks that plaintiff might bring legal action to recover his earnout from the Contingent Payments, which he would forfeit if he were terminated for cause.

¶ 30    Banks contended that it was necessary to terminate plaintiff, despite the risks for the company, because plaintiff's behavior was "egregious" and was harmful to the company and the leadership. Moreover, Banks testified that "not only would the Chicago leadership team lose all credibility, but so would the Columbia team in general," if plaintiff were allowed to keep working for the company. McQuaid still did not budge from his position, although he did maintain that plaintiff's insubordination did violate the employee manual and code of conduct, and that he could be terminated for cause.

¶ 31    Due to McQuaid's determination to keep plaintiff employed with the company, Banks asserted that he had to take matters into his own hands. Banks decided to terminate plaintiff despite McQuaid's and the rest of the executive management group's insistence to the contrary. Banks asserted that the Formal Warning "meant nothing" to him and that it would be easy to replace plaintiff, because anybody could be replaced. However, when Banks informed McQuaid of his ultimate decision, McQuaid offered to terminate plaintiff himself, because he had a closer working relationship with plaintiff.

¶ 32    Although Banks himself did not read through the definitions for cause outlined in the C-WAM and BOA employee handbook and code of conduct until after plaintiff's termination, he instructed Cooley to do so for him before determining if plaintiff could be fired for cause. Additionally, Banks had the company's general counsel, Price, review the standards for cause in order to make sure that plaintiff's termination for cause was legally acceptable.

¶ 33    As a result of plaintiff's termination, he forfeited his Contingent Payments, which would have vested a few months after his termination. The resulting money stayed within the BOA organization–including C-WAM and Columbia–when it vested. This appeal followed.

¶ 34                              II. ANALYSIS
¶ 35               A. Standard of Review for Summary Judgment Motions
¶ 36    Plaintiff contends that the circuit court's grant of summary judgment in favor of defendants for counts I through VI, the issue of termination for "cause," and for counts VIII through IX, the issue of breach of contract in regard to the Formal Warning, was improper. Defendants contend that summary judgment was proper because plaintiff was justly terminated for cause and the Formal Warning was not a contract. Summary judgment is proper where the pleadings, depositions, affidavits, admissions, and exhibits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is thus entitled to judgment as a matter of law. *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007).

¶ 37    On the other hand, a triable issue of fact exists where there is a dispute as to one of the material facts, or where a reasonable trier of fact might differ in drawing inferences from facts that are not in dispute. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162-63 (2007). A defendant may nevertheless succeed on its motion for summary judgment by disproving the plaintiff's case with uncontradicted evidence that would entitle it to judgment as a matter of law or by establishing that the plaintiff lacks sufficient evidence to prove an essential element of its cause of action. *Argueta v. Krivickas*, 2011 IL App (1st) 102166, ¶ 6. For appeals such as this, on the circuit court's grant of defendant's motion for summary judgment, this court will review the motion *de novo*. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004).

¶ 38        B. Summary Judgment on Issue of Termination for "Cause" was Proper
¶ 39    Plaintiff contends that the circuit court erred in granting summary judgment in favor of defendants because a genuine issue of material fact exists as to whether plaintiff was terminated for "cause," as set forth in the Plan. Defendants, on the other hand, maintain that plaintiff was properly terminated for cause because he engaged in misconduct that injured the company, which is grounds for termination for cause under plaintiff's Agreement. The parties represented in this case disagree as to: the definition of "cause" in the employment agreement; whether an injury was caused by plaintiff's conduct; and whether the evidence established the requisite "cause" for termination.

¶ 40    According to plaintiff's Agreement, which was executed on December 19, 2000, he could be fired for "cause." In the Agreement, "cause" for termination was defined as: "conviction of a felony, engaging in misconduct that injures the Company, performing your duties with gross negligence or any material breach of your fiduciary duties as an employee of the Company." Plaintiff's subsequent employment agreement, the Letter Agreement, executed on October 31, 2001, adopted the standard of cause put forth in the Agreement. However,

the Formal Warning lowered the standard for "cause," to termination for "*any* future violation of the Company's standards in *any* aspect of your job." (Emphasis added.) Nevertheless, in assessing whether plaintiff's behavior satisfied the requirements of termination for cause, one only needs to look to the Agreement, which was in effect prior to the "mooning."

¶ 41      Plaintiff asserts that the circuit court erred when it determined, as a matter of law, that plaintiff's conduct injured the company. Defendants, on the other hand, contend that plaintiff's misconduct directly injured the company by: impugning the status and credibility of the company's management; disregarding company interests in maintaining an orderly work environment; wasting the company's resources in addressing the "mooning" and its aftereffects; and causing the company to terminate a financially valuable employee (plaintiff). Both parties derive their understanding of injury from the Agreement, but diverge in regard to their understanding of the terms of the Agreement.

¶ 42      In order to understand the intent of a contract, the court must consider the document in its entirety and give the language contained therein its plain and ordinary meaning. *Salce v. Saracco*, 409 Ill. App. 3d 977, 981 (2011). Moreover, under Illinois law, the contract must be construed as a whole, by viewing each component in light of the others. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007) (citing *Board of Trade v. Dow Jones & Co.*, 98 Ill. 2d 109, 122-23 (1983)).

¶ 43      In Illinois, employers have a right to expect a certain standard of conduct from their employees in matters that directly concern their employment. *Lachenmyer v. Didrickson*, 263 Ill. App. 3d 382, 388 (1994). Our legislature defines a violation of this standard of conduct, or "misconduct," as "the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees." 820 ILCS 405/602 (West 2010). Moreover, an employer does not need to present direct evidence of the existence of a reasonable rule or policy; instead, a court can simply determine that such a policy exists through a common-sense realization that some behavior "intentionally and substantially disregards [the] employer's interest." *Lachenmyer*, 263 Ill. App. 3d at 388.

¶ 44      Plaintiff contends that "misconduct that injures the Company," should be construed to mean *serious* injury to the company. Plaintiff asserts that this is the case because the other actions mentioned by the Agreement as justifying termination for cause appear to be very serious transgressions–conviction of a felony, material breach of fiduciary duties (which defendants assert are the highest form of duty an employee can owe to an employer), or performing your duties with gross negligence. Nevertheless, this does not help to explain why the "mooning" was not just as serious: a serious act of misconduct that injures the company. Therefore, using a commonsense interpretation of plaintiff's behavior in "mooning" Sayler and McQuaid, in accordance with *Lachenmyer*, it is clear that plaintiff's insubordinate behavior injured the company.

¶ 45      According to plaintiff's Agreement, his duties included "observ[ing] all rules and regulations which the Company may establish governing the conduct of its business and that of its affiliates." The BOA employee handbook provided additional information regarding

the company's rules and regulations, which plaintiff and other employees of BOA were required to follow, and plaintiff acknowledged his receipt of said handbook and compliance with its policies by signing a form of acknowledgment in 2004. This handbook stated that "insubordination" and "conduct unbecoming an associate" were prohibited and that:

> "Disruptive, unruly or abusive behavior by associates in the workplace *** is not tolerated. Inappropriate conduct includes verbal or physical threats, fights and obscene or intimidating behavior, as well as any other abusive conduct. *** Associates who violate any provision of this policy are subject to disciplinary action up to and including immediate termination of employment."

Plaintiff violated the rules and regulations in the handbook by behaving in a disruptive, unruly, and abusive manner–"mooning" Sayler and McQuaid and informing Sayler that he was not welcome in that office and that plaintiff hoped he would never return to the Chicago office–that also may be considered obscene behavior. Therefore, according to the Agreement, plaintiff violated his duties as an employee of the company.

¶ 46     Plaintiff contends that the "mooning" had nothing to do with "performing his duties." Yet, not only do the Agreement and employee handbook state that plaintiff's actions violated his "duties," but the context of the situation furthers the "commonsense realization" (*Lachenmyer*, 263 Ill. App. 3d at 388) that he was performing his duties; interacting with his superiors while at his place of employment.

¶ 47     There is no ambiguity in these facts. The clear interpretation of plaintiff's behavior is that it was insubordinate, disruptive, unruly and abusive. Thus, the behavior caused injury to the company by undercutting the authority of plaintiff's bosses–including Banks, Sayler, and McQuaid–and disregarding company policies, calling for: the observation of all rules and regulations which the company establishes to govern the conduct of its business and that of its affiliates, as stipulated in the Agreement.

¶ 48     In *Lachenmyer*, the court determined that the plaintiff's action of throwing a work paper folder at his direct supervisor constituted willful misconduct. *Id.* at 384-87. A strikingly similar standard of misconduct was also noted in a case construing unemployment benefits, where the court concluded that misconduct such as abusive and offensive language directed at superiors within the employee's company qualified as misconduct that injures the company and thus justified termination for cause. *Messer & Stilp, Ltd. v. Department of Employment Security*, 392 Ill. App. 3d 849, 859 (2009) (citing *Yoldash v. Review Board of the Indiana Employment Security Division*, 438 N.E.2d 310, 314 (Ind. Ct. App. 1982)). As a result, it adheres to commonsense logic that plaintiff's behavior in "mooning" his superiors would either fall under the same category or be regarded as more severe misconduct than using profanity in speaking to one's superiors at work.

¶ 49     The clear conclusion here is that plaintiff was justly terminated for cause: for engaging in misconduct that injures the company. As such, plaintiff's misconduct, which injured the company, is sufficient to justify his termination for cause. Therefore, we hold that plaintiff does not state a genuine issue of material fact, where a reasonable trier of fact might differ in drawing inferences from facts that are not in dispute. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163-64 (2007). As such, plaintiff was justifiably terminated for cause because his

act of "mooning" Sayler and McQuaid satisfied the standard for misconduct that injures the company. For the foregoing reasons, we affirm the grant of summary judgment in favor of defendants and we need not address the issue of gross negligence.

¶ 50                                    C. Plaintiff's Breach of Contract Claim

¶ 51    Plaintiff also asserts that the circuit court erred in granting summary judgment in favor of defendants because a genuine issue of material fact exists concerning his breach of contract claim. Plaintiff argues that a question of material fact remains as to whether defendants breached a contractual agreement with plaintiff when they terminated him for cause after issuing him a Formal Warning. Defendants respond that the Formal Warning was not a contract and, thus, plaintiff presents no issue of material fact because one cannot sue for breach of contract if no contract existed.

¶ 52    Plaintiff contends that the Formal Warning was a contract, which provided that plaintiff would retain his employment with the company contingent on the fact that he did not commit any further violations of the company's standards in any aspect of his job. Plaintiff maintains that the Formal Warning was a contract because it contained a promise clear enough for plaintiff to believe that an offer had been made. Defendants respond that the Formal Warning was not a contract, but was simply a disciplinary letter that lowered the standard of cause for termination if plaintiff did commit any future violations of the company's standards. Defendants assert that the Formal Warning did not prevent terminating plaintiff for the "mooning" on April 27, 2005, because the language in the Formal Warning did not contain any specific promises of future employment.

¶ 53    According to *Duldulao v. Saint Mary of Nazareth Hospital Center*, a policy statement may create an enforceable contract if the traditional requirements for the formation of a contract are present: (1) the language of the policy statement must contain a promise which is clear enough that the employee would reasonably believe that an offer had been made and (2) the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490 (1987). Whether a document constitutes a clear and unambiguous contract is a question of law, and courts must interpret the plain language of the document to determine whether it contains a promise clear enough for the employee to reasonably believe that an offer has been made. *C.A.M. Affiliates, Inc. v. First American Title Insurance Co.*, 306 Ill. App. 3d 1015, 1020 (1999); *Doyle v. Holy Cross Hospital*, 186 Ill. 2d 104, 111 (1999).

¶ 54    In *Duldulao*, the Illinois Supreme Court determined that the plaintiff's employee handbook constituted an enforceable contract. The court noted that the language of the handbook contained a promise clear enough that the employee would reasonably believe that an offer had been made. Furthermore, the handbook was disseminated to the plaintiff in such a manner that she was aware of its contents and reasonably believed it to be an offer. *Duldulao*, 115 Ill. 2d at 490. However, in *Duldulao*, the plaintiff's employee handbook specifically stated that " '[a]t the end of 90 calendar days since employment the employee becomes a permanent employee and termination contemplated by the hospital *cannot occur*

without proper notice and investigation.' " (Emphasis in original.) *Id*. at 490-91.

¶ 55       On the contrary, the Formal Warning, which was disseminated to plaintiff, did not have such specific and mandatory language constituting an offer. The Formal Warning outlined: plaintiff's behavior, *i.e.*, the "mooning," which had propelled the executive management team to issue the letter; the seriousness of the matter and the company's policies that plaintiff had violated; the fact that plaintiff's behavior was unacceptable and the lowered standard of "cause" for termination; outlets for plaintiff to explore if he thought his behavior were a result of any mental imbalance; and McQuaid's "hope" that further disciplinary actions would not be necessary and that plaintiff would be able to continue working for the company.

¶ 56       At no point did the Formal Warning outline a specific course of action for dealing with potential disruptive, unruly, or abusive behavior in the future; it only stated that if there was any future violation of the company's standards in any aspect of plaintiff's job, he would be subject to further disciplinary action, *up to* and including termination. The Formal Warning did not contain language nearly as specific and mandatory as the contractual language in the employment handbook in *Duldulao*, which also stated that, " 'three warning notices within a twelve-month period *are required* before an employee is dismissed.' " (Emphasis in original.) *Id*. at 491. Moreover, the Formal Warning contained no offer or promise of continued employment, only a "hope," on McQuaid's behalf, that no further disciplinary action would need to be taken and that plaintiff would remain an employee of the company.

¶ 57       There was also no consideration involved in the drafting of the Formal Warning; plaintiff, McQuaid, and Hamilton did not negotiate the terms of the letter, plaintiff simply signed the letter, attesting to the fact that he had "read and underst[ood] the contents of this warning." However, plaintiff maintains that since he and McQuaid both signed the Formal Warning, it must have been a contract. Nevertheless, according to *Rudd v. Danville Metal Stamping Co.*, the requirement that an employee sign a document, in order to acknowledge his or her receipt of that document, does not transform the document into a contract. *Rudd v. Danville Metal Stamping Co.*, 193 Ill. App. 3d 1009, 1010-12 (1990).

¶ 58       At no point was there any discussion of the terms of the Formal Warning or any opportunity for plaintiff to insert his desires or demands as to the contents of the letter, as would be the case if it were a contract and not simply a warning letter. Moreover, although plaintiff contends that McQuaid testified that the Formal Warning signified his "word," and that his word signified a "promise," plaintiff fails to acknowledge the important fact that there was no use of the word "promise" in the Formal Warning, nor was there any oral contract for continued employment between McQuaid and plaintiff. Furthermore, at no point did the letter state that it was a contract; to the contrary, it was explicitly called a *warning* and not a contract.

¶ 59       For the foregoing reasons, this court finds that summary judgment in favor of defendants, in regard to plaintiff's breach of contract claims, is proper because plaintiff does not present any genuine issue of material fact. Despite plaintiff's contentions to the contrary, the Formal Warning was not a contract. Therefore, since there was no contract, there can be no breach of contract, and thus, there is no genuine issue of material fact in regard to plaintiff's breach of contract claims. Since we affirm the decision of the circuit court in granting summary

judgment in favor of defendants, we need not consider plaintiff's claim that the trial court improperly struck his jury demand.

¶ 60                                    III. CONCLUSION

¶ 61        For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 62        Affirmed.